HOPPE, Administrator, etc., vs. THE CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

*October 16 — November 6, 1884.*

| | |
|---|---|
| 61 | 357 |
| 76 | 548 |
| 61 | 357 |
| 87 | 583 |
| 87 | 653 |
| 61 | 357 |
| 96 | 367 |
| 61 | 357 |
| 102 | 224 |

RAILROADS: NEGLIGENCE: EVIDENCE. *(1, 4) Speed of trains: Court and jury: Estimate of non-expert. (2) Killing of child: Contributory negligence of parents. (3) Track used as a foot-way.*
PRACTICE. *(5) New trial: When second motion barred. (6) Appeal: Review of order denying new trial. (7, 8) Special verdict: Form: Discretion: Instruction as to consistency. (9) General and special verdict.*
DAMAGES. *(10) For killing infant child.*

1. Upon the evidence in this case (stated in the opinion) the question whether the killing of plaintiff's intestate was due to negligence of the defendant in running its train at an unlawful rate of speed within the limits of a city, was properly submitted to the jury, and an affirmative finding in that behalf cannot be disturbed.

2. The evidence in this case,—showing among other things that plaintiff's intestate, a boy sixteen months old, whose parents were poor, had been left in charge of his brother seven years old, while his mother went across the railroad track to milk her cow in a pasture; that a few minutes later the child was killed by a passing train upon the track immediately opposite a hole in the fence through which the mother had gone; and that the mother knew that once, a few weeks before, the child had followed her upon the track through such hole in the fence,— is *held* not to prove conclusively that negligence of the parents contributed to the death of the child. That question was therefore properly submitted to the jury.

3. Evidence that the railroad track at the point where the child was killed was considerably used as a foot-way by people residing in the vicinity, was admissible.

4. A non-expert witness may testify as to his estimate of the rate of speed at which a railroad train was moving, but such an estimate is very unsatisfactory proof and should be received with great caution.

5. The unconditional denial of a motion for a new trial is a bar to a second motion upon the same ground.

6. An order denying a new trial is reviewable on an appeal from the judgment, but this court is confined, on such review, to the record proper.

Hoppe, Adm'r, vs. The Chicago, Milwaukee & St. Paul R'y Co.

7. The form of a special verdict is largely in the discretion of the trial court, and if the questions submitted cover all the controverted issues of fact and are reasonably specific, this court will not interfere.

8. The trial judge may properly admonish the jury to make their answers to the several questions submitted for a special verdict consistent with one another.

9. Where a special verdict is found, a general verdict is unnecessary; but its rendition is not error, especially when it is merely a correct conclusion of law from the special findings.

10. Damages of $1,000 awarded for the killing of a healthy boy sixteen months old, whose parents were poor and approaching middle life, are *held* not excessive.

APPEAL from the Circuit Court for *Dodge* County.

On August 15, 1881, the plaintiff's intestate was run over and killed by a train of cars running on the railway of the defendant company, in the city of Watertown. The plaintiff has been duly appointed administrator of the estate of the deceased, and brings this action under the statute to recover damages for such killing, alleging that the same was caused by the negligence of the defendant's employees in charge of such train. The deceased was an infant, not quite sixteen months old, and the son of the plaintiff.

At the time of the death of his son the plaintiff resided in the Fifth ward of the city of Watertown, and occupied a piece of land containing about three acres. The defendant's railway, leading from Watertown to Portage City and La Crosse, passed in a northwest direction through such parcel of land, leaving about two acres thereof southwest of the railway and one acre northeast thereof. The plaintiff's residence was on the two-acre parcel, and the one acre was used by him as a pasture for his cow. The plaintiff is a laboring man and is poor. He was then in the employ of the railroad company. His family consisted of himself, his wife, and four children,— Gustave, Otto, Jules, and Emil, the deceased. He was about thirty-eight years of age; his

wife was forty-two; and the children were aged, respectively, about twelve, eight, and six years, and sixteen months.

Fences had been theretofore erected and maintained by the defendant through the tract of land so occupied by the plaintiff. There was a hole in the fence on the southwest side of the track, caused by the absence of the two middle boards between two posts. It is about twenty rods from the plaintiff's house to this hole, and there was a well-beaten track between them. The plaintiff's wife was accustomed to use this path when she went to milk her cow, except in wet weather.

After the plaintiff and his family had eaten their supper on the evening of August 15, 1881, but while it was still full daylight, Mrs. Hoppe went across the railroad track to milk her cow, and the plaintiff went to the west side of his house and commenced sawing wood. Before Mrs. Hoppe left the house she directed Gustave, the eldest child, to wash the supper dishes, and told Otto, the next eldest, to watch the baby, meaning the deceased. A very few minutes thereafter Emil was run over, immediately opposite the hole in the fence, and killed by a passing freight train running from Watertown to Portage City. The engineer of such train saw something on the track at the point where Emil was killed, when he was probably eighty to one hundred rods distant therefrom, but supposed it to be a dog or some other animal. When he was within twelve or fifteen car-lengths of the object — about twenty-five or thirty rods — he discovered it was a child. He promptly whistled for brakes, reversed his engine, sanded the track, and used every available means to stop the train. The train hands were at their proper posts and promptly applied the brakes. But the momentum of the train was such that although running up a grade, which the testimony tends to show was forty-six feet to the mile, they did not succeed in stopping it until the

locomotive and four or five cars had passed the point where Emil was struck.

Twenty-six rods southeast of that point the railroad crosses a plank road which the evidence shows was much traveled. There were other traveled streets or roads within the city limits north of the plank road in the vicinity of and beyond the plaintiff's residence. The railroad track through plaintiff's premises and down to the plank road was much used as a foot-way by persons residing in that vicinity.

It is in evidence that a few weeks before Emil was killed he went on the track at the same point, having followed his mother, who had gone to milk her cow. This fact was known to Mrs. Hoppe. The plaintiff had resided in the same place since the preceding April, and the train in question was a regular freight train, which passed the plaintiff's residence daily at nearly the same hour. The speed of the train which ran over Emil when it crossed the plank-road is variously estimated by the witnesses at from six to fifteen miles per hour.

The court overruled a motion for a nonsuit, and, on the demand of the defendant for a special verdict, submitted certain questions of fact to the jury, which, with the answers of the jury thereto, are as follows:

" 1. Was the death of Emil Hoppe caused by the train of defendant on the 15th day of August, 1881? *A.* Yes.

" 2. At what rate of speed was the train running when it passed the whistling-post southeast of the Portland plank road? *A.* At twelve miles per hour.

" 3. What was the average rate of speed of the train between the junction and the point where the engineer discovered that a child was on the track? *A.* Nine miles per hour.

" 4. Did the engineer and train-men do all that could have been done to stop the train and avoid the accident? *A.* No.

" 5. Prior to the accident were persons in the habit of traveling or passing along defendant's track between the junction and Bonner street? *A.* Yes.

" 6. On the 15th day of August, 1881, was there an opening in the fence at the point where the path leading from plaintiff's house crosses the fence? *A.* Yes.

" 7. If you answer that there was an opening, what kind of an opening was it, and how long had it existed? *A.* An opening from one post to another, with the exception of the top and bottom boards, which opening existed from November, 1880, and until after the accident.

" 8. Did the parents of the child know of or use said opening before August 15, 1881? *A.* Yes.

" 9. Was the death of Emil Hoppe occasioned by the negligence of the employees or servants of the defendant? *A.* Yes.

" 10. If you answer yes to the last question, of what negligence was defendant guilty? *A.* Of not fixing the fence at said opening, and also of not running the train slow enough within the limits of the city.

" 11. Was the death of Emil Hoppe occasioned in part by contributory negligence of his parents, or either of them? *A.* No.

" 12. Do you find for plaintiff or for the defendant? *A.* For the plaintiff.

" 13. If for the plaintiff, at what sum do you assess the damages? *A.* At $1,000."

The jury also found a general verdict for the plaintiff, assessing his damages at $1,000.

A motion was made for a new trial upon the alleged ground, *inter alia*, that counsel for the plaintiff had indulged in improper remarks in his closing address to the jury. The court denied this motion, and judgment was entered pursuant to the verdict. Counsel for the defendant afterwards moved the court upon affidavits to set aside the judgment

and grant a new trial. This was denied. Such affidavits are returned with the record. They relate to the alleged improper remarks of counsel.

This appeal is by the defendant from the judgment, and from the order denying the motion to set the same aside.

For the appellant there was a brief signed by *John W. Cary* and *D. S. Wegg*, attorneys, and *Burton Hanson*, of counsel, and the cause was argued orally by *Mr. Hanson*. They contended, *inter alia*, that the fact that it did not appear that the witness Lounsbury was capable of estimating the speed of a train, taken in connection with his position with reference to this train — almost directly in front of it as it approached,— rendered him wholly incompetent on the question of its rate of speed. *Grand Rapids & I. R. R. Co. v. Huntley*, 38 Mich. 537; *C. & N. W. R'y Co. v. Schumilowsky*, 8 Bradw. 618. The fact that a babe sixteen months old was permitted, at such an hour of the evening, to go from its house to a railroad track — a distance of 340 feet — and remain there unattended, of itself shows negligence on the part of those having it in charge. *C. & N. W. R'y Co. v. Schumilowsky*, 8 Bradw. 613; *Toledo, W. & W. R'y Co. v. Grable*, 88 Ill. 441; *Meeks v. Southern Pacific R. R. Co.* 52 Cal. 602; *Cauley v. P., C. & St. L. R'y Co.* 2 Am. & Eng. R'y Cas. 4; *Philadelphia & R. R. R. Co. v. Hummell*, 44 Pa. St. 376–8; *St. Louis, I. M. & S. R'y Co. v. Freeman*, 36 Ark. 41; *Gibbons v. Williams*, 135 Mass. 333; *Bellefontaine R'y Co. v. Snyder*, 24 Ohio St. 670. Under the circumstances the defect in the fence and the failure of the company to remedy it, existed without negligence on the company's part, and were assented to by the parents of the child in the use which they made of it. Pierce on Railroads, 422; *Tyson v. K. & D. M. R. Co.* 43 Iowa, 207; *Cleland v. M. & St. L. R'y Co.* 29 Minn. 170; *Whittier v. C., M. & St. P. R'y Co.* 24 id. 405; *S. C.* 26 id. 484; *Laude v. C. & N. W. R'y Co.* 33 Wis. 647. The damages are excessive.

*Potter v. C. & N. W. R'y Co.* 22 Wis. 615; *Rogers v. Henry*, 32 id. 330; *Lehman v. Brooklyn*, 29 Barb. 234; 2 Thomp. on Neg. 1292.

*Harlow Pease*, for the respondent.

LYON, J. The questions, whether the death of the plaintiff's intestate was caused by the negligence of the employees of the defendant company operating the train, and, if so, whether the parents of the deceased were guilty of negligence which contributed to his death, were submitted to the jury for their determination. The first question was answered by the jury in the affirmative, and the second in the negative. If they were properly thus submitted, the verdict supports the judgment for the plaintiff, and the judgment cannot be disturbed unless error in some other respect has intervened. The important, if not the controlling, questions to be now determined are, therefore: Does the evidence prove conclusively that the defendant was free from negligence? and, if not, Does it prove conclusively that the plaintiff and his wife were guilty of any negligence contributing to the death of their child?

The jury found the defendant guilty of negligence in not repairing the opening in the fence on plaintiff's premises through which the child went on the railroad track, and because the train was running at too high a rate of speed. They also found that the train was running at the rate of twelve miles per hour when it passed the whistling-post before it reached the plank road crossing, and that its average rate of speed between the junction and the point where the engineer discovered that a child was on the track was nine miles per hour.

I. The testimony bearing upon the rate of speed of the train will first be considered. The junction mentioned in the findings is understood to be something over 200 rods southeast of the plank road. The distance of the whistling-

post from the plank road crossing is understood to be about forty rods.    The grade of the road, from the junction to the place of accident, is unequal.    The testimony tends to show that it varies from five and one half feet to forty-six feet per mile.

Only two witnesses estimated in miles the speed of the train.   One Lounsbury, a witness for the plaintiff, who saw the train just as the signal for brakes was sounded, probably near the plank road crossing, estimated its speed at that point at fifteen miles per hour.   The engineer of the train, a witness for the defendant, testified that he thought the train was running at the rate of about six miles an hour, from the time it started until it stopped, and that he was sure it was not running fifteen miles an hour.

Although no other witness estimated the speed of the train, there are many facts and circumstances, which the testimony tended to prove, that have an important bearing on the question.   One of these is the fact that the train was moving on an ascending grade, and for that reason could doubtless be more readily stopped.   Another is that after the child was discovered on the track, the engine reversed, and brakes signaled and applied, and after every possible effort had been made by the train-men to stop the train, the testimony tends to show that it must have moved, on this up-grade of forty-six feet to the mile, a distance of thirty to thirty-five rods.   We think it cannot be held as a matter of law that a train running not more than six miles an hour, on such a grade, could not be stopped in that distance, with all the efforts that were made to stop this train.   Were this a question of law at all, we are strongly inclined to think that the opposite should be held.   Another fact, testified to by the conductor of the train, is also significant.   He says that he was standing in the caboose when the engine was reversed, and it threw him head-first — sent him to the other end of the car.   This, and other facts and circumstances

which the testimony tends to prove, pertain to or constitute the *res gestæ* from which, as well as from the estimates of witnesses, the inference of negligence, or the absence of it on the part of the defendant, is to be deduced. To draw such inference is peculiarly the function of the jury, as this court has held in many cases. See *Sutton v. Wauwatosa*, 29 Wis. 21; *Kenworthy v. Ironton*, 41 Wis. 647; *Bohan v. M., L. S. & W. R'y Co.* 58 Wis. 30, and cases therein cited.

It should be remarked, in this connection, that the estimate of a witness, especially of a non-expert, of the rate of speed of a moving railway train, is very unsatisfactory proof, and should be received with great caution. If the *res gestæ* renders it impossible, or even highly improbable, that the estimate can be or is correct, it should be rejected. *Muster v. C., M. & St. P. R'y Co. ante*, p. 325, is such a case; this is not.

It is conclusively proved that the railway track, from the junction to the place of the accident, was within the corporate limits of the city of Watertown; that, at least until the train passed the plank road, it crossed traveled streets; and the evidence tends to show that it had not passed all the traveled streets in that city, crossed by the track, when Emil was killed. Hence, any rate of speed exceeding six miles per hour, at or near the place of the accident, was unlawful (R. S. sec. 4393), and if such unlawful rate of speed contributed to the death of Emil it was negligence.

Our conclusion is that the question, whether the death of the boy was caused by the negligence of the defendant in running its train at an unlawful speed, was properly submitted to the jury, and that their finding in that behalf cannot be disturbed. This conclusion renders it quite unnecessary to consider the question of the defendant's alleged negligence in not repairing the fence through which the deceased went upon the railroad track.

II. We are next to determine whether the evidence proves

conclusively that the negligence of the plaintiff or his wife contributed directly to the death of Emil.   The facts upon which this question is to be determined are not numerous or complex.   The mother of Emil knew that he had once, a few weeks before his death, gone upon the railway track through the hole in the fence.   Under what circumstances he went there does not appear.   They might have been such as not to show that he was liable to repeat the act. At any rate, it does not appear that he did repeat it until the time he was killed, although several weeks had elapsed. However, it may be conceded that the fact of his once going there to her knowledge laid upon his mother an obligation of increased diligence to keep him off the track.

When she went to milk her cow on the evening Emil was killed, she left him in charge of his elder brother Otto, then seven years of age.   Some consideration is due to the fact that the family were poor, and it was doubtless necessary, in carrying on their domestic affairs, that the services of each member of the family should be fully utilized.   The labor of children of tender years is often valuable and necessary in such a family, and such children often acquire efficiency and discretion beyond their years.   The testimony does not show the capacity of Otto in these respects.   That is left to inference, to be drawn (if at all) from the condition and circumstances of the family.   If Otto had sufficient judgment and discretion to watch and care for Emil during the temporary absence of his mother from the house, or if she had reason to believe that he had, negligence cannot be imputed to her for leaving the child in his charge.   Whether she had reason so to believe or not was peculiarly a question for the jury to determine, upon due consideration of all the testimony bearing upon it.   So, also, was the question whether the exercise of due care did not require the plaintiff to stop the hole in the fence.

It must be held that negligence on the part of the parents

of Emil, or either of them, contributing to his death, was not conclusively established by the evidence, and hence that the question of their negligence was properly submitted to the jury.

III. This appeal is not only from the judgment, but from an order denying a motion to vacate the same and for a new trial, made after the judgment had been entered. The motion was made at a subsequent term, and was founded upon affidavits showing that the counsel for the plaintiff made certain remarks in his closing argument to the jury which it is alleged were improper. A motion on the minutes for a new trial had been made at the trial term and denied. This motion was founded in part upon the same ground; that is, upon alleged improper remarks by such counsel to the jury. The motion was denied unconditionally, and no leave was given or asked to renew it. This was a complete bar to the second motion, and the same was properly denied. *Branger v. Buttrick,* 28 Wis. 450; *Moll v. Benckler,* id. 611.

The first order denying the motion for a new trial is reviewable on the appeal from the judgment. R. S. sec. 3070. In reviewing the same, however, this court is confined to the record proper, and cannot look into the affidavits upon which the second motion was founded, for these form no part of the record. Looking into the bill of exceptions we find a very few disconnected remarks of counsel preserved therein, and as soon as objection was made thereto the court promptly interposed and required counsel to confine himself to legitimate argument. The record discloses nothing in this respect which could operate to the prejudice of the defendant.

IV. A special verdict was demanded on behalf of the defendant, and its counsel proposed twenty-three questions to be submitted to the jury. The court prepared and submitted to the jury the questions contained in the above statement of the case, five of which were proposed by such

counsel. None of the remaining questions were submitted in the form proposed; some of them were not submitted in substance. For this omission error is assigned.

It is unnecessary to state or discuss these questions in detail. It is quite sufficient to say that we think the questions proposed cover and include all the controverted issues of fact in the case, and that they are reasonably specific. The form of a special verdict is very largely in the discretion of the trial judge, and we find in this case no failure by him to exercise such discretion properly and wisely.

V. Neither do we find any error, of which the defendant can be heard to complain, in the charge of the judge, or in his refusal to give certain instructions asked in behalf of the defendant. A point is made against the charge because the jury were admonished to make their answers to the several questions submitted to them consistent one with another. The reports of numerous cases in this court, in which judgments have been reversed because the special findings were not consistent with each other, show that the admonition was not ill advised. It certainly cannot be error to direct a jury to do a certain thing, when the judgment based upon their verdict would be reversed were they to disobey the direction.

The instructions asked fill six pages of the printed case. They were not given in the form proposed. Those which relate to the negligence of the defendant in not keeping the fence in repair have ceased to be of any importance in the case, for reasons already stated. The substance of the others, in so far as applicable to the specific questions submitted to the jury, and in so far as they correctly stated the law, were sufficiently contained in the general charge, which contains a clear, accurate, and sufficiently comprehensive statement of the law of negligence applicable to the case.

VI. 1. It was not error to allow proof that the railway

track, through the premises occupied by the plaintiff, was considerably used as a foot-way by people residing in that vicinity. It pertains to the *res gestæ*. But the evidence is of little importance. Strike out the special finding on that subject and the plaintiff would still be entitled to judgment.

2. Neither was it error to allow the witness Lounsbury to estimate the speed of the train. It is not required that a person must be an expert before he can be allowed to testify to the speed of a railway train, a horse, or any other moving object.

VII. The damages are not so excessive (if they are excessive) as to justify the interference of this court. It appears that Emil was a healthy child, and had walked for six months before he was killed. Expectations that he would live to reach manhood, and would be of substantial pecuniary benefit to his parents, were not unreasonable. Besides, his parents were poor and were approaching middle life. These are all elements to be considered in assessing damages in such a case. Having due regard to them, we cannot say that they have not suffered by the death of their child a pecuniary loss of $1,000.

VIII. Although a general verdict was unnecessary, it was not error that one was found. The general verdict is merely a correct conclusion of law from the special findings, and it neither benefited nor harmed either party.

Our conclusion upon the whole case is that the record discloses no material error against the defendant, and hence that the judgment of the circuit court cannot lawfully be disturbed.

*By the Court.*— Judgment affirmed.