CITY OF AUSTIN V. O. H. NUCHOLS.

Decided February 14, 1906.

**1.—Evidence—Declarations of Agent—Cases Discussed.**

The grounds of decision in City of Austin v. Forbis, 12 Texas Court Reporter, 147 (reversed by Supreme Court, 13 Texas Ct. Rep., 818), explained.

**2.—Declarations of Corporate Agent.**

The declarations of an agent, made in reference to an act which he is authorized to perform, and at a time when he is conducting the business, stand upon the same footing as the acts themselves and are admissible against the principal.

**3.—Same.**

A statement by the foreman in charge of the electric lighting plant of a city who came to the place where an employe of a business to which the city furnished lights had been injured by an overcharged wire, for the purpose of investigating the accident and about fifteen minutes after it occurred, to the

effect that the "transformer" therein was of an old style and insufficient, that the city had sent for new ones to replace them, and that some other kind of light would have to be used till the new "transformers" arrived, was admissible against the city in an action by the injured person to show that such machinery used by defendant was defective.

### 4.—Declarations—Res Gestae.

Declarations on one in a position to know the cause of an injury to plaintiff, made spontaneously under the immediate influence of the transaction, and characterizing or explaining it, though shortly after the occurrence, are admissible as part of the res gestae.

### 5.—Municipal Corporation—Duty of Inspection.

Whether the duty of inspection of its appliances by the proprietor of an electric plant applies to a municipal corporation engaged in such service or not, there was no error in submitting the issue as to negligence in such inspection when the evidence showed that it was in fact made the duty of the foreman to inspect.

### 6.—Negligence—Electric Appliances.

Evidence considered and held insufficient to justify submission of the issue whether an electric appliance was insufficient when originally established, the testimony showing only that it was of old style and had become defective.

Appeal from the District Court of Travis County. Tried below before Hon. George Calhoun.

*Allen & Hart,* for appellant.—The evidence of Fiegel's declarations was incompetent and inadmissible. Abbott on Trial Evidence, sec. 51, pp. 55-6; Alabama G. S. Ry. v. Hawk, 72 Ala., 117; Louisville & Nash. Ry. v. Carl, 91 Ala., 271; Missouri Pac. Ry. v. Ivy, 71 Texas, 416; San Antonio & A. P. Ry. Co. v. Robinson, 73 Texas, 287; Gulf, C. & S. F. Ry. v. Moore, 69 Texas, 160; Texas & N. O. Ry. Co. v. Crowder, 70 Texas, 223; City of Austin v. Ritz, 72 Texas, 400; Gulf, C. & S. F. Ry. Co. v. York, 74 Texas, 368; Galveston, H. & S. A. Ry. v. Legierse, 51 Texas, 204; San Antonio & A. P. Ry. v. Belt, 46 S. W. Rep., 374; Wilkins v. Ferrell, 10 Texas Civ. App., 236; Houston, E. & W. T. Ry. v. Norris, 41 S. W. Rep., 710.

The court erred in admitting the testimony of George Fiegel, over objection, because he had no authority to bind the city or make any statement. Gulf, C. & S. F. Ry. Co. v. York, 74 Texas, 368; Missouri Pac. Ry. Co. v. Sherwood, 84 Texas, 136; Houston & T. C. Ry. Co. v. Hicks, 2 U. C., 437; City of Austin v. Forbis, 13 Texas Ct. Rep., 818.

It is error in the court to charge on matters not established or proven by the evidence. Western U. Tel. Co. v. Tobin, 56 S. W. Rep., 540; Felker v. Douglas, 57 S. W. Rep., 323.

A municipality is only required to use ordinary care to keep the municipal property in good condition, unless it has actual notice of defects which might cause injury. Galveston v. Barbour, 62 Texas, 176; Galveston v. Smith, 80 Texas, 70; Phillips v. Dallas, 3 Texas App. Civ., 360.

The defendants, having installed suitable appliances to protect its consumers of electricity, had a right to expect that those appliances would perform the duties for which they were installed and, unless they had actual notice to the contrary, are not liable. Same authorities.

*Walton & Walton* and *A. S. Phelps,* for appellee.—The declarations of Fiegle, Jr., the city electrician, were admissible through the mouth of Bierce and were competent and not obnoxious to the objections made by appellants, because they were declarations within the scope of his authority in that he was authorized to inspect said transformer and take it down, and he had charge of the whole electrical system and he was the one that was authorized to give information pertaining thereto, and said remarks were made by said Fiegle before he took said transformer down and only twenty minutes after Nuckles was hurt in his presence to Bierce, and also that other lights would have to be used in that the transformer was an old style one and would arc over; on both phases and under all the objections urged said testimony was competent and admissible. Abbott's Trial Evidence, sec. 50, p. 54; Green v. Boston & Lowell R. R., 128 Mass., 225; Lane v. Boston & Albany R. R., 112 Mass., 455; Gott v. Dinsmore, 111 Mass., 45; Bank of Monroe v. Field, 2 Hill, 445; St. Louis, A. & T. Ry. v. Mackie, 9 S. W. Rep., 451; International & G. N. R. R. Co. v. Lewis, 23 S. W. Rep., 323; Western U. Beer Co. v. Kirchevalle, 26 S. W. Rep., 147; Western U. Tel. Co. v. Barefoot, 74 S. W. Rep., 560.

Paragraph 9 of the court's charge was fully warranted by the evidence and a correct and proper enunciation of the law applicable to the same. Texas & St. L. Ry. v. Suggs, 62 Texas, 323; Scott v. London, etc., Docks, 3 Hurl. & C., 596; Transportation Co. v. Downer, 11 Wall., 129; Washington v. Missouri, K. & T. R. R. Co., 38 S. W. Rep., 764; Edgerton v. New York & H. R. R. Co., 39 N. Y., 229; Shearman & Redfield on Negligence, 280.

FISHER, CHIEF JUSTICE.—This is a suit by Nuchols against the city of Austin, and the Austin Water, Light & Power Commission, for damages sustained while in the employ of an ice company, known as the Austin Ice & Bottling Works, in the city of Austin.

Appellee alleges that as engineer of the Austin Ice & Bottling Works, and while in the discharge of his duties as such, he came in contact with an electric light wire, and was severely shocked and burned. It was alleged that the city of Austin, through its water, light and power commission, was supplying the Austin Ice & Bottling Works with electric lights, and that the wires that furnished the lights connected with one of the main wires under the control of the appellants.

For grounds of negligence it was substantially alleged: 1. That the water and light commission was in charge and control of the water and electric light system of the city of Austin, and that it negligently allowed the electric wires, insulators, apparatus and appliances to become disarranged and out of order and dangerous, and was guilty of negligence in not discovering such condition; and they negligently allowed and permitted more than 2,000 volts of electricity to be conducted into the plant of the Austin Ice & Bottling Works over wires that only had a capacity of and were only intended to carry 100 volts of electricity. 2. That they were guilty of negligence in constructing, operating and maintaining the system of electric lights, in that they placed what is known as a Woods transformer on its line of electric light wires which conducted electricity into the plant of the Austin Ice & Bottling Works;

and that appellant knew, or could have known by the exercise of ordinary care, that the transformer was defective.

The appellants pleaded a general denial, and specially that the accident was caused by the act of God, in that shortly prior to the accident, the city of Austin and vicinity was visited by a severe and unusual electrical storm, which disarranged the electrical wires, machinery and appliances over the entire city of Austin, and that the accident was directly attributable to the effect of that storm on the wires; and that appellants did not have any knowledge of the condition of the wires or the transformer at the Austin Ice & Bottling Works; and, further, that the transformer was a proper transformer of a standard make, and that by no means known to electrical science could it have been discovered by inspection that the transformer had been disarranged by the storm.

A trial before a jury resulted in a verdict and judgment in appellee's favor for $2,658.

The first assignment of error complains of the action of the trial court in admitting that part of the evidence of the witness Bierce, as follows: "It was probably some fifteen minutes after the accident before Mr. Fiegle came down. He came back to where Nuchols and the rest of us were. Mr. Fiegle said in the presence of Nuchols, probably five minutes after he first saw him there at the ice house, that that transformer was an old-style transformer, and that, even if the fuse was burned out, the distance was so short—I think it was four or five inches—the electricity would arc over without a fuse in there, and he said there were seven or eight in addition to this, and that they had sent to Chicago to get new ones to replace those, and that until they did get them at this place, we would have to use some other kind of lights." The witness further continues and states, "We were out of lights some eight or nine days," and that this statement made by Fiegle was with reference to the Austin Ice & Bottling Company's transformer, that was one of the eight.

The evidence tends to show the purpose and use of a transformer, and that it was a part of the apparatus used in supplying the Austin Ice & Bottling Works with electricity. The transformer was under the control of the appellants as a part of their electric system. Fiegle was the foreman that had control of the electric wires and appliances, and it was his duty to inspect the same and to see that the wires and appliances were in proper order, and when defects occurred, to repair and remedy the same. This evidence was offered as having a tendency to show that the transformer in question was of an old style, and would not properly and safely perform the service for which a transformer was intended. In other words, as evidence for what it was worth as tending to establish the second ground of negligence alleged.

This evidence was objected to on the ground that it was incompetent, inadmissible and hearsay, and that it was not a part of the *res gestae,* and that the statement of Fiegle, the agent, was in relation to a past transaction, and that at the time of the declarations he was not acting within the scope of his authority in relation to any business of his principal. And it is seriously contended that in the recent case of the city of Austin v. Forbis, 13 Texas Ct. Rep., 818, the Supreme Court

passed upon a similar question, and held the testimony not admissible. It is true that in that case the Supreme Court did hold the declarations and statements of Fiegle, Sr., and Fiegle, Jr., inadmissible, and disagreed with this court on that question. The evidence there offered arose under the fifth assignment of error, which complained of the action of the trial court in admitting a conversation between Fiegle, Sr., who was chairman of the water, light and power commission of the city of Austin and one of the parties to that suit, and George Fiegle, Jr., who was the city electrician and foreman of the electric light system. The conversation occurred about two hours after Forbis received his injuries. It was to the effect that Fiegle, Sr., asked Fiegle, Jr., why he did not have the circuit that Forbis was working on taken out, and the latter said, for the reason that "Gissel up there was baking bread," and Fiegle, Sr., then stated to him, "Are you going to burn a man up for two loaves of bread."

In our opinion in the Forbis case, 12 Texas Ct. Rep., 147, in holding this evidence admissible we did not, except in a meager way, elaborate our views with reference to the admissibility of that evidence, or extensively discuss the question and state all the reasons why such evidence was admissible, but we expressed the view that the testimony was admissible and are still of that opinion; but, however, the final authority has differed with us as to this question, and that settles the matter. In the Forbis case, as disposed of in this court, it was charged that Fiegle, Jr., was guilty of negligence in not cutting off the current of electricity, and also that he was incompetent. He was then the foreman of the electric light system, as it appears he is now in the case before us. He was under the control of the water and light commission, of which body Fiegle, Sr., was a member and was chairman. The Water & Light Commission was and is a corporate body, consisting of three members; and it was their duty to exercise ordinary care to employ competent servants, and to exercise a like care in keeping the electric system in a reasonably safe condition, and provide its servants with reasonably safe places in which to perform their work.

Forbis, at the time he was injured, was a servant of the Water & Light Commission, and was repairing a wire which was overcharged with electricity and was thereby injured. The condition was such that Fiegle, Jr., in charge of the wire, should have had the current cut off at the time that Forbis was engaged in the work. There was evidence in that case also, tending to show that Fiegle was incompetent. Fiegle, Jr., obtained his authority to perform the duties required of the Water & Light Commission from that body; and if Fiegle, Jr., by reason of his negligence or incapacity to perform the service for which he was employed, permitted improper, defective and dangerous conditions to arise, which became known to the Water & Light Commission, or which, under the circumstances, they should have become aware of, it was their duty, in the exercise of ordinary care to their servants and the public, that they should take proper steps to investigate the matter and to have repaired such defects as existed, and to inquire into the cause that produced the dangerous conditions that might and would probably result in injury to its servants and to the public generally. In accomplishing this purpose, it is hardly to be supposed that the Water & Light Com-

mission would and should go in a body and investigate a defect, or interview a servant who was charged with the duty of repairing same, or whose conduct or incapacity was the occasion of it, but that body doubtless had the power to select one of its members, or one of its members, especially its chairman, without special authority, could in the line of his duty, make such investigation as might be necessary under the circumstances.

If it be conceded that the duty existed, as was clearly indicated in the Forbis case, upon the part of the Water & Light Commission, to employ competent servants, and to investigate and inquire, in the interest of its employes and the public, into dangerous conditions that then existed or had arisen by reason of the negligence or incompetency of those in charge, we see no reason why the commission as a board should be called together and formally and officially pass upon the question, and investigate it in that way. If an electric light wire in front of my residence should be discovered defective and in a dangerous condition, would it be necessary for me to call a formal meeting of the board of the Water & Light Commission? Is it not reasonable to suppose that the proper method to pursue would be, if the chairman of that body could be found, to inform him of the condition? And could it be safely contended that if he was so informed he would not have the authority to direct his foreman Fiegle to go and make such repairs as were necessary, and to remove the dangerous agencies that might cause injury to some one of the public. Now that was evidently what Fiegle, Sr., in the Forbis case was undertaking to do when he interviewed Fiegle, Jr. He was evidently at that time acting in the capacity, or, in other words, the jury had the right to believe that he was so acting, as chairman of the Water & Light Commission, investigating a subject that was under the authority and control of the commission. And it would be folly to say, in this matter of detail, to make the conduct in this respect binding upon the Water & Light Commission, that it would be necessary for the whole body or a majority of it, to be present and interview Fiegle, Jr.

Considering the matter from the standpoint of an ordinary corporation, it would not be expected that the board of directors of a railway company or of a bank should meet formally for the purpose of investigating and inquiring into the negligent conduct of one of its employes; but it is usual in such cases to delegate that authority to some one that has the power to represent the corporation in the control of that particular individual; and this duty is usually performed, or, in other words, can be performed by the general manager or the president. And, in order to justify the exercise of such authority by him, we did not in the Forbis case believe that it was necessary that any express power should be shown, but that it might be implied from the nature of his official position.

The authority so exercised by Fiegle, Sr., would not be that of a chairman or president seeking to bind the corporation by contract, but was merely in reference to a matter of detail which such official could as well investigate as the corporate body. And Fiegle, Sr., being then chairman of the commission, we thought, and still think, that his power to inquire into the cause of the accident and to investigate the conduct

of the foreman, could be implied, especially as there was no evidence to the contrary; and that his authority in that respect should be likened to that of a president of a business corporation. And with reference to which, there being no express limitations upon his power, many authorities hold that in matters relating to the duties of the corporation, especially those relating to matters of detail and subordinate officers and affairs, he has the power to act, and when done is binding upon the corporation.

In the Forbis case Fiegle, Sr., in making the inquiry of Fiegle, Jr., was in the pursuit of a duty, first, because it was proper that he and the Water & Light Commission should be informed as to how the accident occurred, and why the duty of cutting off the current had not been performed; second, that it was proper that he should investigate the matter in order to determine if the servant or employe, Fiegle, Jr., was competent or incompetent to correctly perform the duties of his position. The reply made by Fiegle, Jr., to Fiegle, Sr., would be admissible as a part of that transaction, and the reason given by him for not cutting off the current would be in the nature of a report to his superior officer; and the trivial reason that he did give could be given some weight by a jury in passing upon the issue as to the incompetency of Fiegle, Jr. If Fiegle, Sr., had the authority to make the inquiry of Fiegle, Jr., why the current was not cut off, the response of the latter would be admissible. (Xenia Bank v. Stewart, 114 U. S., 224.) Fiegle, Jr., when called upon by his superior to account for and give a reason why the accident occurred, still occupied his official position as foreman of the electric lines and appliances, and his reply to the request for information would be something to be said or done in the line of his performance of duty. If Fiegle, Sr., had the authority to demand of Fiegle, Jr., the information, it was the duty of Fiegle, Jr., to furnish the information. And what both parties, being superior officers, said in that connection would be, in our opinion, as said in the Forbis case, admissible. We do not mean to say that a mere idle conversation or private communication between corporate officers would be admissible. In disposing of the Forbis case, we did not regard the conversation between the two Fiegles as of that nature. Of course, at the time of the statement, the principal transaction to which it related was past. But if Fiegle, Sr., had the authority which we assumed he had, his declarations and statements, and that of his subordinate officer in response, would be admissible.

In Williams v. Christian College, 29 Mo., 250, it was held that a statement by a member of a board of trustees at a session of the board was admissible.

In Malecek v. Tower Grove Ry. Co., 57 Mo., 17, the statement of a superintendent of a street railway, made three days after the act, admitting an assault by one of its servants upon a passenger, was held admissible.

In Morse v. Connecticutt R. R. Co., 6 Gray, 450, it is said that "a corporation as a principal can be approached only through its agents after a transaction is past; and for this reason, the rule that the declarations of an agent are admissible only when made contemporaneously

with the transaction, or in regard to a transaction then depending, is not strictly applied in the case of corporations."

In St. Louis Ry. Co. v. Weaver, 35 Kan., 413, it was held that a conversation between the chief engineer in charge of repairs and the division roadmaster, as to the condition of the road, was admissible.

In Keyser v. Chicago, etc., Ry. Co., 33 N. W. Rep., 870, it was held that the report of an engineer, which he was required to make to his foreman as to the facts and cause of an accident, was admissible.

In Roberts v. Port Blakely Ry. Co., 70 Pac. Rep., 113, the statement of the manager of the railway, three hours after the accident, as to its cause, was held admissible.

In Xenia Bank v. Stewart, 114 U. S., 224, it is held that the response of an officer to an inquiry from one who has a right to make it, relating to a matter in his charge is admissible.

Section 1177, Wharton on Evidence, states the rule as follows: "As has been already incidentally seen, a party who commits the management of his whole business, or of a particular line of his business to an agent, is bound by the admissions of the agent as to his entire business committed to him; nor when the agent is a general agent, representing his principal continuously, is it necessary for the admission of such declarations that they should either have been part of the *res gestae,* or should have been specially authorized. Eminently is this the case with corporations. Thus, it has been held in England that in a suit against a railway company for a lost parcel a statement made by the station master generally representing the defendant, intimating that the parcel was stolen by a porter of the defendant, is admissible against the defendant. So, in Massachusetts, in an action against a manufacturing corporation for a nuisance, a statement of its superintendent that the nuisance existed and would be remedied, and that he would not have it around his place for $500, is competent evidence against the corporation, the superintendent being the corporation's general representative." Then the section quotes the Kansas case above referred to and states the general principle that generally, the power of an agent to admit transfers the agent's admissions to his principal.

As said before, in passing upon the admissibility of the testimony in the Forbis case, we were influenced by the idea, although not expressly stated in our opinion, that it could be safely assumed, or at least, it was a question of fact for the jury, that Fiegle, Sr., as chairman of the commission, had the implied power to act; and that his position as chairman was similar to that of a president of a corporation, and that the principles of law that applied to one would apply to the other. As to the power of a president, and what duties are implied, there is great conflict of authority, but we are of opinion that the weight of authority, where there is nothing appearing to the contrary, establishes the proposition that, as to matters of detail and minor supervision over the employes, the president may represent the corporation.

Judge Thompson in his valuable work on Corporations, in volume 4, sections 4617, 4618, 4620 and 4621, says:

"As nearly every branch of business is now largely conducted by private corporations, it becomes of the utmost importance to members of the public who are obliged to deal with these concerns, to know to

what extent they can safely act upon the assumption that their chief officers possess the power to bind them by contracts in the ordinary course of their business. Undoubtedly, the popular understanding has come to be that the president of a corporation may be regarded, in the absence of notice to the contrary, as possessing the authority to bind the corporation which the name of his office would import; as being its chief presiding and managing officer, its official organ in its dealings with the public, and its chief contracting agent for the ordinary purposes of its business. No doubt most lawyers have drifted into the same conclusions; certainly the author of this treatise had until he discovered by a long examination of the judicial authorities that there were two opposing theories with reference to the implied or *ex officio* powers of a president of a business corporation, one of which conforms to the popular understanding above stated, and ascribes to him prima facie the powers of its managing agent for its ordinary business." Under this he cites many authorities and states also the opposite rule. In section 4618, he says:

"The view deducible from these and other like expressions of doctrines, seems to be that the law ascribes to the president of a business corporation the authority of its general agent, for the purpose of binding it by contracts made within the ordinary scope of its business, and that, in the absence of notice to the contrary, persons dealing with the corporation may safely act upon that assumption. To use an every-day illustration, let us suppose that a corporation is formed to deal in a certain article of commerce. Any member of the public can safely act upon the assumption that the president of the corporation is authorized to make sales for the corporation of that article in the ordinary course of its business, and no resolution of its directors conferring such authority need be shown." For this view he cites many authorities.

Again, in section 4620, in combatting the view that very few powers are ascribed to a president of a corporation, he states: "But in utter contradiction of this, it is plain that the concession that he has the implied power to manage the litigation of the bank enables him to reach the same result through the machinery of the judicial courts, by instructing the attorney of the bank to withdraw a defense, or to allow judgment to go against the bank or otherwise. Nor can it escape attention that the doctrine which ascribes to him the power to control the litigation of the bank, which is extraordinary business, and which at the same times denies him the power to bind the bank by contracts in the course of its ordinary business, is extremely illogical and absurd. For instance, nothing can be more illogical than a decision which denies to him the power to accept an order upon a third person in satisfaction of certain notes held by the bank, and which yet ascribes to him an *ex officio* power to control the general litigation of the bank." Citing authorities.

Again, in section 4621, in discussing the implied power of a president, and admitting the same to exist, he says: "Under this theory it has been held that he has the power to make ordinary sales in the course of business, of the goods or commodities in which the corporation deals; to prosecute and defend ordinary litigation of the corporation and appoint attorneys to that end; to endorse its negotiable paper for the

purpose of transferring title to it, in the ordinary course of business; to purchase chattels used in the ordinary course of its business; to pay a broker for effecting sales of goods in which the corporation deals; to make such an acknowledgment of a debt due by the corporation, it being a bank, as will take it out of the statute of limitations; to take a conveyance of land to himself in an attempt to save a debt due the corporation, and his estate will be protected against consequent loss; to arrange to renew a debt due the corporation, it being a bank; to certify under the charter that the note sued on is bona fide property of the incorporated bank which sues; to authorize a broker to sell certain stock which the bank has taken to secure a loan; in the case of a bank, to draw, endorse and accept bills of exchange, give certificates of deposit, etc., in the course of ordinary business; and to assign mortgages given by the subscribers for their shares, the same being payable to him." And for all of these illustrations, he cites authorities. Judge Thompson concludes with the statement that "it should be carefully kept in mind that under the opposing theories already referred to, there is contrary judicial authority on nearly all of the preceding points."

In the case of Lyndon Mill Co. v. Lyndon Literary Institute, 63 Vt., 581, 25 Am. St. Rep., 783, the court says: "Who then was the proper person to make the contract? Certainly the president. We must bear in mind that these kinds of artificial men or persons are becoming very common in this State. The Legislature turns them out almost as rapidly as the miller does his grist. They compose a new element or ingredient of modern society; they contract with everybody and about all manner of things, and they contract by their chief officers, and such is their usual course of business. The president of a company presents himself to make a contract, evidently connected with the business—he declares the object and purpose of the contract. Who doubts him? We are a dealing people; is he asked to produce the charter and the books of the company to show that he is authorized to make the contract *secundum artem?* Such is not the custom."

Stokes v. the New Jersey Pottery Co., 46 N. J. Law, 237, says: "The president of a business corporation is its chief executive officer; he may, without any special authority from the board of directors, perform all acts of an ordinary nature which by usage or necessity are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business." Such is the rule also announced in Boone on Corporations, section 144.

The question in the Forbis case, by reason of the ruling of the Supreme Court contrary to our decision, has become a dead issue, and we would not again and at length review that question, but for the earnestness with which appellant contends that the evidence here objected to is controlled by the decision of the Supreme Court in the Forbis case. Conceding that we were mistaken in the views stated, and giving full force and effect to the opinion of the Supreme Court in the Forbis case, the evidence here objected to is admissible under a different rule, and is not embraced within the rule announced in that decision. There are two aspects of the doctrine of *res gestae* upon which this evidence may rest:

1. It is the statement and declaration of an agent made in reference

to an act which he is authorized to perform, and at a time when he is conducting the business, or making preparations to that end. "The declarations of an agent of a corporation as to the matters in his charge, accompanying his acts as agent, stand upon the same footing as the acts themselves." (4 Thomp. Corp., secs. 4913, 4914; 24 Am. and Eng. Ency. Law, pp. 662 to 672; Mechem on Agency, sec. 714.) In applying this rule and the one to be discussed, we must look to the facts of the particular case. O'Connor v. Chicago, etc., Ry., 6 N. W. Rep., 481, 484. For much apparent confusion has arisen in the case law upon this subject in determining when the rule does and does not apply; but much of the supposed differences between the several courts upon this subject can doubtless be accounted for upon the ground that in each particular case in which there is an apparent conflict with some other, there are some facts peculiar to each case, which, if closely scrutinized, distinguishes it from the others. Therefore, our purpose will be, not merely to state the general rule, but to call attention to cases which in their facts are somewhat similar and in which the rule has been applied.

In Lund v. Tyngsborough, 9 Cush., 36, it is said that "when the act of a party is given in evidence his declarations made at the time, that tend to elucidate and explain it, are admissible."

Roberts v. Port Blakely Mill Co., 70 Pac. Rep., 113, was where the manager of a railway company a few hours after the accident, arrived upon the scene, and looking for the cause discovered it to be a defective flange upon a wheel, and to that effect so stated. The declaration was held admissible.

Mining Company v. Rogers, 7 Am. St. Rep., 199, 11 Col., 6, was a case where the plaintiff was injured by reason of defective machinery, and its connecting appliances. A short time after the accident the foreman admitted in a statement made by him, that the appliances were unsafe. This was objected to as hearsay. The court in holding the evidence admissible, says: "The foreman was defendant's agent in charge of the mine, and was upon the ground when the plaintiff was injured. He proceeded at once to the shaft and directed the employes to fix the appliances in question. His remark was called for by the accident, and was uttered while giving instructions with reference to that which plaintiffs claim was the cause. His purpose in the changes ordered was undoubtedly to remove danger and prevent repetition of similar injuries in the future. He was acting directly in the line of his duty, and, for the time being, stood in the shoes of his principal."

In Beaver v. Taylor, 1 Wall., 637, it appears that an agent of the defendant sent by letter receipts to his principal. It was held that it was proper for the agent to transmit the receipts, and that what was said and done in that connection was *res gestae.*

In Illinois Central R. R. Co. v. Troustine, 2 So. Rep., 256; and Green v. Boston & L. Ry., 128 Mass., 221, and like cases, where the agents were charged with the duty of looking for or accounting for lost or missing property of the plaintiffs, their declarations and statements made in reference thereto, and in response to inquiries about the property, were held admissible.

It appears from the facts in Texas & Pacific Railway v. Lester, 75

Texas, 58, that the engineer was killed in a wreck caused by the track being worn and weak and out of line. A witness for the plaintiff, over defendant's objection, testified that about one o'clock p. m. on the day of the accident, which was about half after one, p. m., while witness was present when the section men were at work on the section where the accident occurred, the track walker came up and the section boss or some one of his men asked him how things were down below, and he said "all right, except the track is spread over beyond Rush, you had better look after it." The reply had reference to the place where the accident afterwards occurred. The evidence was objected to on the ground that it was the declaration of a third party and was hearsay. The court in holding the evidence admissible said: "The evidence clearly indicates that the statement was made by a servant of the defendant whose duty it was to ascertain the condition of the track and report it to other servants, whose duty it was to repair it," and said that the statement was a part of the *res gestae* and was admissible. See also the Compton case in the same volume.

International & G. N. Railway v. Telegraph Co., 69 Texas, 280, was an action for damages by apellee against the railway company for destruction of telegraph poles. The court, in passing upon the admissibility of the declarations of one Painter, a servant of the railway company, whose duty it was to remove the poles, says: "With one exception, the declarations of Painter to Breckenridge, the admission of which is complained of in the second assignment of error, were properly admitted in evidence. Painter was in the employ of the defendant, and the testimony shows that he was its agent, charged with the duty of removing plaintiff's poles from the right of way. His declarations were about a matter in the scope of his authority and before the transaction to which they referred was completed. They tended to show that defendant's officers or agents claimed that the line was partly on defendant's right of way, and that they had determined to remove the poles."

In Missouri, K. & T. Ry. Co. v. Russell, 88 S. W. Rep., 380, where the wornout and defective condition of the engine which resulted in delay, etc., was an issue the plaintiff was permitted to testify, "that at Muenster, he asked the conductor why he started out with that engine, and he replied that he had to go with whatever they started out with, and admitted that he knew that he could not get far with it." It was objected to on the ground that the statements of the conductor was hearsay. The court said: "We are inclined to think that this assignment is not well taken. The conductor was the agent of the defendant in charge of the train when he made the statement, and his knowledge of the condition of the engine when it started out, it seems to us, was the knowledge of the principal, and his admission that he knew the condition of the engine was admissible in evidence as an admission against interest." Citing the following cases: Texas & P. Telephone Co. v. Prince, 82 S. W. Rep., 327; Cooper v. Britton, 74 S. W. Rep., 91; Standefer v. Aultman, 78 S. W. Rep., 552; Plotz v. Miller, 51 S. W. Rep., 176.

To show the application of these authorities we mention the following facts: As before said, Fiegle was the superintendent of appellant's electric lines, that is, he had the control and supervision of seeing that

the lines were properly erected and kept in proper order and condition; and this duty applied to all the appliances that were used and necessary to be used in the use and operation of the electric lines. It was Fiegle's duty to inspect the lines and appliances, and supply whatever might be necessary, and to remove any defective appliances and to repair any condition that needed it. The evidence shows that Fiegle, a short while after the accident, went to the scene of the accident, evidently for the purpose of inquiring into and ascertaining the nature of the accident and cause thereof, and was there on the ground when this declaration and statement was made for this purpose; and with the further object of repairing and removing whatever condition might be found to be defective, and to make such repairs as might be necessary. The statement was made to Bierce, who was interested in the matter of seeing that the lights and the wires were kept in proper condition, for the reason that he was at the time an engineer in the employ of the Austin Ice & Bottling Works. Fiegle stated that the transformer would have to be removed, and that they would have to use (referring to the bottling works) some other lights. When he made this statement he was acting as superintendent; he was there for the purpose of seeing what the defect was. When he supposed that he had discovered it, he informed the people who were interested in the matter that the transformer would have to be removed, and that they would have to use some other kind of lights. He was then in the discharge of his duty, and his conduct and statement explanatory of what followed was admissible. A short time after the statement was made, he did cause the transformer to be removed.

The verbal act, to make it admissible as a part of the *res gestae,* need not solely be predicated upon a physical act that is then at that time being performed. The act may consist in a statement, or the statement may accompany conduct or explain conduct which would not amount to a physical act; and the declarations so made may relate to a condition already existing which is within the knowledge of the declarant and about and concerning which he is then charged with the performance of some duty. The question is whether he had the authority and the right, and whether it was his duty at that particular time to make the statement that was made. It was his duty, or, in other words, it was the duty of the Water & Light Commission, to furnish the bottling works with electric lights; and when Fiegle appeared upon the scene and having the authority as he did to cut off the lights, or to remove the appliances which furnished the same, it was not only his right but it was his duty to inform those connected with the bottling works of his purpose and intention to do so. His conduct in doing that thing was official, and whatever he stated in connection with the performance of that duty would be admissible.

2. The statement of one in a position to know, at the time of the act or near thereto, spontaneously made without design, that characterizes and explains the act, is admissible. "The coincident rule," that is, that the declarations or admissions must be strictly contemporaneous with the act, which obtains in some jurisdictions, does not prevail in this State. (International & G. N. R. R. Co. v. Anderson, 82 Texas, 517.)

The tendency of the later cases in the United States is to regard the mere point of time as less material, and to treat the declarations and admissions as admissible if they spring from the transaction in controversy, and tend to qualify, characterize or explain it, and are voluntary and spontaneous, and are made at a time so near as to preclude the idea of deliberate design. According to the doctrine of these cases, each transaction is to be judged by its own peculiar facts without conclusive regard to a fixed interval of time, and with more regard to the question whether the declaration or admission seems to have been voluntarily and spontaneously made under the immediate influence of the principal transaction, and are so connected with it as to characterize or explain it. (1 Greenleaf, sec. 108; Keyser v. Chicago Ry., 33 N. W. Rep., 867; Travelers' Insurance Co. v. Mosely, 8 Wall., 397; 24 Am. & Eng. Ency. Law, 660 to 690; Meacham on Agency, sec. 715; International & G. N. Ry. v. Anderson, supra.)

Gulf, Colorado & Santa Fe Ry. Co. v. Pierce, 7 Texas Civ. App., 600, was a case where a brakeman was charged with the duty of opening and closing a switch at the time of the accident, which resulted from the failure of the brakeman to perform this duty, and afterwards he stated that he had opened the switch and then gone to sleep. The statement was held admissible.

In Missouri, K. & T. Railway v. Vance, 41 S. W. Rep., 169, within fifteen or twenty minutes after the accident, one of the engineers of the two trains that collided, and when the parties were present at the scene of the accident, made a statement and declaration to the effect that he could not stop his train because the brakes would not work, as the air between the tender and the baggage car was cut off, we held the statement *res gestae,* and therefore admissible.

Kenney v. The State, 9 Texas Ct. Rep., 889, is a case which cites other cases showing that statements made as late as fifteen or thirty minutes, and some later, relative to the act and the cause thereof, were admissible as *res gestae,* provided they were spontaneous and made under such circumstances as to preclude the idea of design.

In DeWalt v. Houston, E. & W. T. Railway, 22 Texas Civ. App., 408, a material statement made by a brakeman five minutes after the accident was held admissible.

In San Antonio & Aransas Pass Railway Co. v. Gray, 95 Texas, 428, a statement by the engineer about six minutes after the accident, "that he came near running over a party down there," which referred to plaintiff, was held admissible.

It is needless to quote from other authorities, but of the great number upon this subject, we refer to Keyser v. Chicago, etc., Ry. Co. and Travelers' Ins. Co. v. Mosely, supra; O'Connor v. Chicago, M. & St. P. Ry., 6 N. W. Rep., 481; Hermes v. Chicago & N. W. Ry. Co., 27 Am. St. Rep., 69; Hanover Railway v. Coyle, 55 Pa. St., 402; Hooker v. Chicago, M. & St. P. Ry. Co., 76 Wis., 542.

Now, applying the last rule to the facts, we find that Fiegle, as soon as he heard of the accident, immediately went to the scene of the accident, as before stated, for the purpose evidently, of ascertaining who was hurt and how the party was hurt, and the nature and extent of his injuries and the cause thereof. He arrived upon the scene within fifteen minutes

of the accident, and in about five minutes thereafter he made the statement and declaration that is objected to. It was his duty to know of the condition of the transformer, as he was required, as the testimony shows, to inspect that and the appliances relating to the electric system. The plaintiff was present at the time, and he made the statement in the presence of the plaintiff. The statement was evidently spontaneous; or, in other words, it can not be said that it was not. It was made when he was there in the performance of his duty, at a time when he thought that he understood the situation, and at a time when he evidently believed that he knew what was the cause of the accident; and clearly, there was no purpose or object upon his part to designedly make a false statement about the matter. He was then in the employ of the city and was supposed to be faithful to the interests of his master; and it can not be assumed that he would knowingly and intentionally make a false statement against his master's interest. The statement made could not be regarded as for the purpose of relieving his master, because whatever effect could be given to it would be against the interest of his master. It is evident that, after viewing and seeing the injured man and the situation, he then reached the conclusion as to what was the cause or supposed cause of the accident, and as the expression of his inmost thoughts, the statement was spontaneously made.

For both of the reasons stated, we are of the opinion that the evidence objected to was admissible.

There are some other objections urged to the charge of the court in submitting the issue to the jury as to the duty of the appellant to inspect the electric lines, in order to ascertain if dangerous conditions existed. Whatever doubt there might be as to the rule of law upon this question, we are clearly of the opinion that the court was justified in the instruction by reason of the evidence bearing upon that question. There can be no doubt that the evidence of Fiegle shows clearly that it was his duty to inspect or to have inspected the electric wires and appliances. There are authorities to the effect, whether they will apply to a municipal corporation may be a question, that either a high degree of care or the exercise of ordinary care must be used in guarding and protecting the public against dangerous agencies, such as electric wires. (10 Am. and Eng. Ency. Law, 872.) If such duty would exist as applied to a municipal corporation, the question would then arise as to how that rule would be affected by the application of another rule to the effect that the city can only be held liable after notice of defect, either actual or constructive; and on the subject of a charge upon the question as to actual or constructive notice affecting the city, we refer to the case of Dallas v. Jones, 93 Texas, 46.

As cases having some bearing on the question as to whether a city should be charged with the duty of inspection, or the exercise of ordinary care to keep its public utilities in proper condition, see Dallas v. Jones, supra; Dallas v. Moore, 74 S. W. Rep., 97; Davis v. City of Austin, 22 Texas Civ. App., 461, 54 S. W. Rep., 927; City of Fort Worth v. Johnson, 84 Texas, 140; Klein v. Dallas, 71 Texas, 285. But, however, as said before, it is not necessary in this case that we should pass upon the law bearing upon this subject; because, as we construe the evidence, the court properly charged upon the question of the duty to inspect and

to exercise ordinary care to repair. The evidence in the record on this question can be given no other construction.

The court in the ninth subdivision of its charge instructed the jury that if they believed from a preponderance of the evidence that after the electrical storm of the 29th and 30th days of July, 1903, the defendants and their agents and employes failed to use ordinary care to inspect the appliances and fixtures for the safe and prudent conduct and operation of the electrical system of the city of Austin; and further find from the preponderance of the evidence that by the use of ordinary care they could have discovered the condition of the transformers and fixtures used by defendants for preventing a stronger current of electricity than was necessary from entering the building of the Austin Ice & Bottling Works; and further find that plaintiff was injured as a result of such negligence, and that they failed to repair their wires after an electrical storm, and plaintiff was not guilty of contributory negligence, then to find for plaintiff. We have not attempted literally to copy the charge, but merely to present some of its main features, in order to show that the court placed the duty upon the defendants, under the evidence, to inspect and to exercise ordinary care after the storm to ascertain the defective condition.

In the tenth subdivision of the charge the jury was, in effect, instructed that it was the duty of the defendants to use ordinary care to inspect and select and to place as proper and safe a transformer on its electric light line, which conducted electricity into the Austin Ice & Bottling Works as the nature and danger of the electric light system permitted; and if you find from a preponderance of the evidence that the transformer which conducted the electricity into the building of the Austin Ice & Bottling Works was not a safe and proper transformer to perform, and that it did not properly perform the duties for which it was manufactured and used; and they further find from a preponderance of the evidence that the defendants, their agents and employes who placed the transformers on the line of electric light which conducted electricity into the Austin Ice & Bottling Works, or that they could have discovered by the use of ordinary care that said transformer was not safe and proper, etc., to perform, and that it would not properly perform the duties for which it was placed on the electric light wires of defendant, and prevent a stronger current of electricity than was necessary from entering the building of the Austin Ice & Bottling Company; and you further find from a preponderance of the evidence that plaintiff was injured as alleged in his petition, and the injuries were caused by the negligence of the defendants, their agents or employes, in not using ordinary care to inspect and select and place as proper and safe a transformer on its line of electric light, which conducted electricity into the Austin Ice & Bottling Works as the nature and danger of said electric light system permitted; and you further find from a preponderance of the evidence that such negligence was the direct and proximate cause of the injuries to plaintiff, as alleged in his petition; and further find from the evidence in this case, that the plaintiff himself was not guilty of contributory negligence, which contributed directly and proximately to such injury, then you will find a verdict for the plaintiff on this issue. But unless you so find, you will return a verdict for the defend-

ants on this issue. And on this issue you are further instructed that if you believe from the evidence that the transformer which was to control the amount of electricity which went into the Austin Ice & Bottling Works plant was a safe and proper transformer, and not defective until after the storm a few days before the injuries to plaintiff, if any, but that the said defect in said transformer, if any, was caused and produced by the storm, a few days previous to the alleged injury to plaintiff, you will return a verdict for the defendants on this issue, as there is no evidence that the defendants had any notice of any defect, if any there was, caused to said transformer by said storm or storms before the injuries herein complained of."

This latter portion of the charge just quoted is in conflict with what we understand to be the issue submitted in subdivision 9 of the charge. The latter subdivision is predicated upon the theory that it was the duty of the appellants, through their foreman, after the electric storm (and there was only one such storm), to exercise ordinary care to inspect the electric wires and appliances, and if by inspection they could have discovered the defect in the transformer, and they permitted it to remain in that condition, and thereby the injury resulted, the plaintiff could recover. The instruction given in the latter part of subdivision 10 is to the effect that if the defect in the transformer did not occur until after the storm, and the same was caused and produced by the storm a few days previous to the time that the plaintiff sustained his injuries, then to return a verdict in favor of the defendants, on the ground that they had no notice of any such defect.

If the court was correct in submitting the issue to the jury, and which we are inclined to think was the case, that defendants were charged with the exercise of ordinary care to inspect after the storm, in order to ascertain if defects existed, it necessarily follows that, if such duty existed, they would be charged with notice of what defects that could have been discovered by the exercise of ordinary care. It requires no argument to demonstrate the proposition that if the defective condition arose by reason of the storm, and the defendants had no notice of such condition, a peremptory instruction for this reason, in their favor, would be in conflict with the issue submitted in subdivision 9. We merely call attention to this discrepancy between the two charges, which will doubtless be corrected upon another trial.

We have given the evidence very careful consideration, and have reached the conclusion that the judgment below ought to be reversed and the cause remanded, for the reason that the testimony is not sufficient to authorize the submission to the jury of the issue as to an original defect in the transformer. Subdivision 10 of the charge, as one of the grounds of negligence, submitted the question to the jury as to whether or not the transformer was originally defective when put in; or, in other words, whether it was the proper kind of a transformer, that could safely be expected to perform the service for which the transformer was intended to be used; and also the issue as to whether or not the transformer became defective prior to the time of the electric storm. After the transformer had been removed, on one side of it a defective condition was found to exist, but when that occurred the evidence does not definitely show. But from the use of the transformer, and the sat-

**22**     TEXAS CIVIL APPEALS REPORTS, VOL. 42.     [*February.*

isfaction it gave prior to the electric storm, the weight of the evidence tends to show that whatever defect there was was produced by the storm. There is nothing in the record, independent of the statement and admission of Fiegle, as testified to by the witness Bierce, which we held to be admissible, and as set out in discussing the first assignment of error, with reference to any defect whatever in the transformer, except the defects that were found in it after it was removed. Fiegle said that the transformer was an old-style transformer, and that if the fuse was burned out the electricity would arc over without any fuse in there; and he said that there were seven or eight in addition—that they had sent to Chicago for new ones to replace them.

We gather from the evidence that the transformer had been put in a few years prior to the time of the accident, and had been in continuous use; and there is no testimony in the record tending to show that, prior to the electrical storm which occurred a few days before the accident, the transformer was defective, or failed to perform the services expected of it. The mere fact that it was old style did not tend to establish the fact that it was defective when originally put in, or that it became defective before the storm. The information conveyed by that expression would simply mean that there were later styles which might perform the service more satisfactorily and in a better way. But the fact that it was an old-style transformer when first placed in use, and so continued, would not be satisfactory evidence that the city or the water and light commission were guilty of negligence in originally putting in use the transformer and continuing its use.

For the error of the court in submitting this issue to the jury, the judgment is reversed and the cause remanded.

*Reversed and remanded.*