Hooker vs. The Chicago, Milwaukee & St. Paul R. Co.

HOOKER, Administrator, Respondent, vs. THE CHICAGO, MIL-
WAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

*February 26 — April 29, 1890.*

*(1, 2) Railroads: Negligence: Rate of speed in cities: Evidence.* (3) Res
gestæ. *(4) Negligence of temporary custodian of child. (5) Use
of railroad bridge as pathway: Licensees or trespassers? (6) New
trial: Newly discovered evidence.*

1. Sec. 1809, R. S., which provides that in cities and villages no train
shall go faster than six miles per hour "until after having passed
all the traveled streets thereof," makes it unlawful for a train,
after entering a city, to go faster than six miles per hour, though
it has not yet arrived at any of the traveled streets thereof.

2. Plaintiff's intestate, his daughter, about five years old, was killed
by defendant's train while she was walking, under the care of an
elderly woman, upon a railroad bridge within the limits of a city.
The testimony — tending to show, among other things, that the
train was running at least twenty-five miles per hour, and that if
it had been running at the lawful rate of six miles the engineer,
after he saw the persons on the bridge, could have stopped the
train before it reached the bridge — is *held* to warrant a verdict
that the accident was caused by defendant's negligence.

3. A declaration by the engineer, after having stopped the train, that
they had "whistled enough for them," was admissible in evidence
as part of the *res gestæ.*

[4. Whether or not negligence of the temporary custodian of the child
should be imputed to the child herself or to the plaintiff, not de-
termined.]

5. Where a railroad bridge has been habitually and constantly used as
a foot pathway by persons going back and forth in that part of the
city, without any objection by the railroad company or warning
that it should not be so used, a person using it for such purpose is
a licensee and not a trespasser.

6. A refusal to grant a new trial on the ground of newly discovered
evidence tending to impeach the competency of a witness to testify
as an expert, *held* not an abuse of discretion.

APPEAL from the County Court of *Dodge* County.

The facts are stated in the opinion. The defendant ap-
peals from a judgment in favor of the plaintiff.

For the appellant there was a brief by *John T. Fish,* attorney, and *Burton Hanson,* of counsel, and oral argument by *Mr. Hanson.* To the point that the declarations of the engineer were not admissible as part of the *res gestæ,* they cited *Prideaux v. Mineral Point,* 43 Wis. 513; *Vicksburg & M. R. Co. v. O'Brien,* 119 U. S. 99; *Chicago W. D. R. Co. v. Becker,* 128 Ill. 545; *Williamson v. C. R. Co.* 30 Am. & Eng. R. Cas. 639.

*Harlow Pease,* for the respondent, to the point that such declarations were a part of the *res gestæ,* cited *Felt v. Amidon,* 43 Wis. 467, 470; 1 Greenl. Evi. 108, and notes; *Keyser v. C. & G. T. R. Co.* 66 Mich. 390; *Lund v. Tyngsborough,* 9 Cush. 36; *State v. Horan,* 32 Minn. 394; *Hanover R. Co. v. Coyle,* 55 Pa. St. 396.

The following opinion was filed March 18, 1890:

ORTON, J. The facts of this case are briefly as follows: On the afternoon of the 14th day of September, 1886, the wife of the plaintiff, and mother of the little girl, Catharine, deceased, let her go with her little playmate, Edith Jones, to the house of one Mrs. Dacey, to spend the afternoon. Mrs. Dacey lived alone, about 325 feet south of the railway bridge, across the west branch of the Rock river, in the city of Waupun, and about 100 feet east of the track. The bridge is 138 feet long, and 76 feet of it, over the water, was inclosed on both sides, and persons going over it had to walk on the ties. It is 1,056 feet south of the north boundary of the city, and about the same distance north of the depot. The road runs north and south through the city, but about 600 feet north of the bridge it curves towards the east. From a point 1,168 feet north of the bridge, on the west side of the track, at the height of an engine cab, the whole track could have been plainly seen, southwards through the bridge, and to Main street beyond, without any obstruction whatever. Mrs. Dacey was a care-

ful, prudent, cheerful, and respectable woman, of mature years, and very fond of children, and had raised several of her own. The little girl, Catharine, was under five years of age. Mrs. Dacey had been walking about with the little girls, trying to entertain them, and they had been throwing pebbles into the water. They came on the bridge at the south end, and walked across to the other end, and then turned round and walked back, as if returning to Mrs. Dacey's house. When nearly through the inclosed part of the bridge, they first heard and saw the train coming towards them with great speed. Mrs. Dacey appeared to have been paralyzed with fear, and, when they got about three feet from the end of the inclosed part of the bridge, the train passed over and killed all three of them.

The road from the north for a considerable distance, and to within a mile of the city, had a descending grade. The train consisted of ten freight and three passenger cars, with the tender and engine. The testimony tends to prove that the train had been running at the rate of forty miles an hour, until it had approached the city, and that afterwards, when within the city limits, it was run at the rate of from twenty-five to thirty miles an hour; and that the engineer saw these persons on the bridge when the train had approached a point 965 feet from them, and might have easily stopped the train before it had reached the bridge, even if it had been running at six miles an hour. He testified that he could stop the train within 600 or 700 feet if it had been running at the lawful speed of six miles an hour, and that he might have stopped it as it was then running within 1,000 feet, and the evidence was that he might have seen these persons at a point over 1,200 feet from them. The train was behind time, which may account for the fast running. The testimony tended to prove, also, that the bridge had, for many years and up to the time of the accident, been habitually and constantly used, by men, women, and

children, going back and forth in that part of the city, as a foot pathway, without any objection, notice, or warning by the company that it should not be so used, until after this accident. As soon as the engineer saw these persons on the bridge, he sounded the danger signal, and the brakes were set, but the air-brakes were out of order and were not used.

The plaintiff sues as administrator for his deceased child. The jury rendered a verdict for the plaintiff at $500, and the defendant's counsel moved to set it aside and for a new trial on the minutes of the court and on affidavits showing that one of the plaintiff's witnesses had testified in the trial to that which was not true. The motion was denied.

We will consider the points made by the learned counsel of the appellant in their order:

1. That the court should have directed a verdict for the appellant. This raises the question of the legal effect of the testimony. The learned counsel of the appellant contends that there is no law that prohibited the running of the train at a rate of speed exceeding six miles an hour after it had entered the city and until it reached the bridge, because it passed over no traveled streets. Sec. 1809, R. S., provides that, "in all cities and villages, . . . no train or locomotive shall go faster, until after having passed all the traveled streets thereof, than at the rate of six miles per hour." This train had entered the city from the north, and was going south. It had not yet come to a traveled street, and, of course, had not *passed* all the traveled streets in that city. It was just about to come to a traveled street, and if it was running, until then, twenty-five miles an hour, it could not stop or lessen the speed to six miles an hour, before it passed at least one traveled street at an unlawful rate of speed. The statute is well framed to prevent this. It must not run within the city at a greater speed than six miles an hour, and the only exception is,

"*after having passed* all the traveled streets thereof." The statute appears very plain. Was such an unlawful speed material in this case? We think it was clearly so. It is quite evident that if the train had been running only six miles an hour after it had entered the city, this accident would not have happened. The train could have been easily stopped before it reached the bridge. Mrs. Dacey would have had time to get off the track after she saw it. This train, 550 feet long, was running at an extraordinary and tremendous rate of speed. According to the testimony of the engineer himself, he could have stopped it if it had been running at a lawful rate of speed. It is hard to believe that the engineer did not try his best to stop the train. And yet I have no doubt that there have been instances when the engineer did not do so, and was not guilty of any intentional wrong. The engineer does not like to stop his train when he sees a person on the track a considerable distance ahead. He expects that the danger signal will be sufficient. Such instances are not rare, and the person does get off in time, and no harm is done. It is not strange that this practice of taking the chances should become habitual. The engineer in this case no doubt did his best to stop his train, but he may not have tried to do so soon enough, at the tremendous rate of speed he was running. The negligence of the company seems to us to have been established beyond all doubt.

It is further contended by the learned counsel that Mrs. Dacey and the children were trespassers on the bridge. We think that there was evidence, which the jury might have believed, that the bridge had hitherto been habitually and constantly used as a pathway to and fro, by the people in that part of the city. Mrs. Dacey was using the bridge as a way through which to get home, and not for play, when the train came in sight. It is clear enough that she was a licensee in the use she made of the bridge, and that

she was using it properly and lawfully.   The negligence of Mrs. Dacey will be considered hereafter.   Aside from that, we think the evidence warranted the verdict.

2. Exception was taken to the testimony of the witness Gerrits, of what the engineer said about the accident, about as soon as he stopped his train, south of the bridge and north of the depot, or soon thereafter.   The testimony was that when asked, "What have you been doing?" he looked up and said they had " *whistled enough for them.*" It seems that the engineer was going towards the bridge when this occurred.   Whatever the jury might understand was meant by this expression, we are satisfied that it occurred near enough to the accident itself to be a part of the *res gestæ* and admissible.   *Felt v. Amidon*, 43 Wis. 467, and other cases cited in the brief of respondent's counsel.

3. The newly discovered testimony to impeach Julius Zimple, one of the plaintiff's witnesses, as a ground for a new trial, was upon the question of his experience and competency as a locomotive engineer and to testify as an expert, and the falsity of his testimony as to how soon the train might have been stopped.   It does not appear that the testimony of that witness conflicted materially with that of the engineer of the train upon the real question whether the train might have been stopped before it reached Mrs. Dacey and the children if it had been running at a lawful rate of speed.   At all events, a new trial ought not to be granted on account of newly discovered evidence of mere impeachment. · *Bunn v. Hoyt*, 3 Johns. 255; *Shumway v. Fowler*, 4 Johns. 425; *Harrington v. Bigelow*, 2 Denio, 109; *Delaney v. Brunette*, 62 Wis. 615; *Schacherl v. St. P. C. R. Co.* 43 N. W. Rep. (Minn.), 837; *Jones v. C., M. & St. P. R. Co.* 43 N. W. Rep. (Minn.), 1114.   There was no abuse of the discretion of the court in refusing to grant a new trial for such cause.   *Smith v. Champagne*, 72 Wis. 480.

The court was requested by the defendant's counsel to

instruct the jury, and did so instruct them, and repeated it several times, that if Mrs. Dacey was guilty of a slight want of ordinary care in going on the bridge with the children, under the circumstances, and that it contributed to, or was the proximate cause of, the death of the child Catharine, they should find for the defendant. The learned counsel of the plaintiff excepted to this instruction, and now asks this court to decide, in support of the judgment, that such instruction was erroneous. He contends that the negligence of the temporary custodian of the child ought not to be imputed to the child herself or to the plaintiff. This court has not yet decided that question. It has frequently held, however, that in such a case, where the child is so young as to be *non sui juris*, it is a material question whether the parent was or was not negligent in committing the child to such temporary custodian, and whether such custodian was of proper age and discretion to suitably care for it. There has been no occasion to go further and decide the above question. *Hoppe v. C., M. & St. P. R. Co.* 61 Wis. 357; *Dahl v. M. C. R. Co.* 62 Wis. 652; *Parish v. Eden,* 62 Wis. 272.

The jury considered the question of the negligence of Mrs. Dacey understandingly and fully, as it had been so often impressed upon them by the court, and must have found that she was guilty of no want of ordinary care that contributed to the death of the child. That was a question peculiarly within *their* province to decide, and their decision of it should be conclusive and a finality if the evidence was not such as to show that she was negligent beyond all question. *Randall v. N. W. Tel. Co.* 54 Wis. 140; *McNamara v. Clintonville,* 62 Wis. 207; *Hill v. Fond du Lac,* 56 Wis. 246; *Kaples v. Orth,* 61 Wis. 531; *Ferguson v. W. C. R. Co.* 63 Wis. 145. We cannot say from the evidence that Mrs. Dacey was guilty of any want of ordinary care in going upon the bridge with the children. She

Hooker vs. The Chicago, Milwaukee & St. Paul R. Co.

had lived near the railroad for several years, but she might not have remembered at what time the train was due, or she may have thought it had already gone by. What were the reasons that actuated her, if she had any beyond merely entertaining the children, we cannot know. If her negligence is to affect the rights of the plaintiff, it should certainly be very clearly proved. We think the jury were warranted in finding that she was not guilty of any want of ordinary care that contributed to the accident. It is therefore unnecessary to decide that she could not be chargeable with negligence in taking care of the child, even to support the judgment. The question is therefore hardly before us, or in such way as to be proper to decide it. The courts of the different states are in irreconcilable conflict on the question, so that our decision of it will have to depend upon which side is the better reason, rather than upon the weight of authority. It is a question of considerable importance, and we will defer the decision of it until it becomes material in the case. The instructions of the court to the jury were very favorable to the appellant. They embraced all that ought to have been given of those that were requested. The county court committed no error of law that ought to reverse the judgment.

*By the Court.*— The judgment of the county court is affirmed.

A motion for a rehearing was denied April 29, 1890.