*/ 69 ⁂*

UNION PACIFIC RAILROAD COMPANY v. JOHN T. CONNOLLY.

FILED OCTOBER 4, 1906. No. 14,205.

1. **Verdict.** A verdict is the unanimous decision made by a jury and reported to the court on the matters lawfully submitted to them in the course of the trial of a cause, and under our practice must be in writing and signed by the foreman.

2. ———. A mere statement by the foreman in open court that the jury have agreed, without stating the nature of the decision they have agreed upon, is not a verdict.

3. **Trial: WAIVER.** On the trial of a cause where two parties were joined as defendants, the jury were called into court and asked if they had agreed upon a verdict. The foreman answered that they had· agreed as to one of the defendants, naming him, but not as to the other, not stating the nature of their decision. The court expressed a doubt as to its right to receive a verdict as to one defendant without a verdict as to both, and asked counsel for suggestions, and, receiving no response, it discharged the jury without receiving a verdict as to either defendant. No objection was made or exception taken to such course. *Held*, That the error, if any, was waived.

4. **Verdict.** After the jury were discharged the foreman delivered a package of papers to the bailiff, who in turn delivered them to the court. Among the papers was what purported to be a verdict in favor of one of the defendants, signed by the foreman. It was delivered at a time and under such circumstances as to afford no opportunity to poll the jury or apply the ordinary tests to determine whether it was the unanimous decision of the jury. *Held*, The trial court properly refused to treat the paper purporting to be a verdict as the verdict of the jury.

5. **Railroads: REASONABLE CARE: QUESTION FOR JURY.** Where a railroad company for many years has permitted the public without objection to cross its tracks at a certain point, not in itself a public crossing, it owes the duty of reasonable care toward those using such crossing, and whether such care has been exercised is ordinarily a question for the jury.

6. ——: ——: ——. The mere fact that warning of the approach of a freight train or portion of a freight train, backing upon and over such crossing, was given by ringing the bell and sounding the whistle does not of itself show that the defendant company had discharged its full duty to those using the crossing. Whether, in view of the time, place and circumstances, further precautions were required is, ordinarily, a question for the jury.

7. **Negligence: EVIDENCE.** That the crossing was located in a populous district and over a system of tracks and switches within the corporate limits of a city; that it was in common use day and night by a large number of people; that such use had been so extensive and long continued that the defendant company was chargeable with notice of it; that a portion of a freight train was backed upon and over the crossing without displaying any lights on the rear car, or having any person stationed on such car, or at the crossing, to give warning of its approach—would warrant the inference of negligence on the part of the company operating the train, although the bell was rung and whistle sounded.

8. Evidence examined, and *held* sufficient to sustain a finding that plaintiff was injured as a proximate result of a failure on the part of the defendant company to give due warning of the approach of a train backing upon and over such crossing, and that the plaintiff was not guilty of contributory negligence.

9. **Harmless Error.** Where contributory negligence is relied upon as a defense, it is error to instruct the jury that, where negligence on the part of the plaintiff is disclosed by him in making his case, the burden of proof is upon him to show that he was not guilty of contributory negligence; but as to the defendant it is error without prejudice.

10. **Instructions: REVIEW.** An instruction which states that it is the duty of a person at a railway crossing to look and listen for approaching trains is not erroneous because of the omission to state the direction in which such person is required to look, especially when a more specific instruction is not asked by the complaining party.

11. **Harmless Error.** Where the entire answer of a witness to a ques-

tion is excluded, but substantially the same matter, so far as competent, is received in answer to a subsequent question, the error in excluding the former answer, if any, is cured.

12. Evidence: Review. Certain evidence tendered by the defendants examined, and *held* properly excluded.

13. Damages. On the facts stated, *held* that a verdict of $27,500 as damages for an injury resulting in the amputation of both legs about five inches below the knee is not excessive.

Error to the district court for Douglas county: Lee S. Estelle, Judge. *Affirmed.*

*John N. Baldwin* and *Edson Rich*, for plaintiff in error.

*T. J. Mahoney* and *J. A. C. Kennedy, contra.*

Albert, C. .

On the 11th day of August, 1902, John T. Connolly was struck and run over by a train, or part of a train, of freight cars operated by the Union Pacific Railroad Company, while attempting to cross the tracks of said company at South Omaha. One foot was entirely cut off in the accident, and both legs were so mangled as to necessitate their amputation about five inches below the knee. He brought suit against the railroad company and Elmer E. Fair, the engineer of the train which inflicted the injury, for damages resulting therefrom, charging that such injuries were occasioned by the negligent operation of the train and the defendant's road at the place where the accident occurred. The plaintiff alleges in his petition that he was struck by the train while crossing the tracks on a crossing which at the time was, and for many years had been, in common use as a public crossing. The negligence charged against both defendants is that the train in question was backed upon and over this crossing without any warning of its approach by the ringing of the bell or sounding of the whistle. The charges of negligence against the defendant company alone are: (1) That the train was backed upon and over the crossing without dis-

playing any light at the end of the train approaching the crossing; (2) that no employee was stationed at the end of such car to give warning of the approach of the train; (3) that it had no flagman or watchman stationed at the crossing. The defendant company filed a petition and bond for the removal of the cause to the federal court on the ground of diverse citizenship, claiming that Fair had been made a party defendant for the sole purpose of evading the jurisdiction of that court. The cause was removed but upon plaintiff's motion was remanded to the state court. The defendants answered separately, denying the charges of negligence, and alleging contributory negligence. The cause has been tried four times in the district court. At the second trial, and after the jury had deliberated for some time, they were brought into court and asked whether they had agreed upon a verdict. Fair's attorney was not present at the time. The foreman answered that they had agreed as to the defendant Fair, but not as to the defendant company. They were then asked as to the possibility of their reaching an agreement upon further deliberation. They indicated that there was none. Thereupon, the presiding judge remarked: "I think I shall have to discharge you." The attorney for the defendant company then called the attention of the court to the statement of the foreman that they had agreed as to the defendant Fair, but the court expressed a doubt as to its right to receive a verdict as to one of the defendants without a verdict as to both, and asked counsel if they had anything to suggest. Receiving no response, the court discharged the jury. Afterwards, the foreman of the jury delivered a package of papers containing, among other things, a formal verdict in favor of the defendant Fair to the bailiff, who in turn delivered it to the court in the absence of counsel. They came into court shortly afterwards and their attention was called to this verdict. Plaintiff objected to receiving it as a verdict on the grounds that it had not been presented until after the jury had been discharged; that it had not been presented

at such time or in such a way as to afford the usual oppor-
portunities for determining whether it was the verdict of
the jury, and that it was not the verdict of the jury. The
record does not disclose what ruling was made on plain-
tiff's objection to receiving this verdict, nor what action
was taken thereon by the court, but, as Fair was a party
to the subsequent litigation in the district court, we infer
that the objection was sustained and that the court re-
fused to receive the verdict. The defendant company then
filed a second petition and bond for the removal of the
cause to the federal court on the ground of diverse citizen-
ship. The court overruled this petition and retained the
cause for trial. At the opening of the last trial the de-
fendants objected to the jurisdiction of the district court
on the ground that the cause was one properly removable
to the federal court, and that the jurisdiction of the state
court had been ousted by the filing of the second petition
and bond for removal. This objection was overruled.
At the close of the testimony adduced by the plaintiff in
making his case a motion was made by the defendant com-
pany for a verdict, which was overruled. Testimony on
behalf of the defendants was then offered and received.
At the close of the trial the defendant company again
asked for an instruction directing a verdict in its favor,
which was denied. The trial resulted in a general ver-
dict for the defendant Fair, and a verdict and judgment
against the defendant company for $27,500. The company
brings error.

The first three assignments of error are so intimately
related that they should be considered together. They
are based on the following rulings: (1) The refusal of the
court to receive a verdict as to the defendant Fair at the
second trial. (2) Overruling the defendant company's
second petition for removal to the federal court. (3)
Overruling the objections made to the jurisdiction of the
court at the last trial. It will be recalled that the cause
had been once removed to the federal court and by that
court remanded to the state court for trial. The second

petition for removal on its face contains nothing that was not presented by the first petition. It is not claimed that the defendant company was entitled to a second order of removal on the same state of facts which had been held insufficient by the federal court when the cause was removed on the first petition, but that the defendant Fair was no longer a party to the controversy after the so-called verdict on the second trial, and, consequently, when the second petition for removal was filed, the controversy was solely between the plaintiff, a citizen of Nebraska, and the defendant company, a citizen of the state of Utah. In short, the second petition for removal was presented on the theory that Fair was eliminated from the controversy by the so-called verdict in his favor at the second trial. There is more than one reason why this theory cannot be sustained. In the first place, no verdict was rendered at that trial. A verdict is "the unanimous decision made by a jury and reported to the court on the matters lawfully submitted to them in the course of a trial of a cause." Bouvier, Law Dictionary. Section 291 of the code provides: "The verdict shall be written, signed by the foreman, and read by the clerk to the jury, and the inquiry made whether it is their verdict." Section 290 is as follows: "When the jury have agreed upon their verdict, they must be conducted into court, their names called by the clerk, and the verdict rendered by the foreman. When the verdict is announced, either party may require the jury to be polled, which is done by the clerk asking each juror if it is his verdict. If anyone answers in the negative, the jury must be sent out for further deliberation." At the second trial, when the jury were brought into court and asked if they had agreed upon a verdict, the foreman merely said they had agreed as to the defendant Fair, but not as to the defendant company. No decision as to any matter lawfully submitted to them was reported to the court at that time; they merely reported that they had agreed upon a decision. It does not appear that at that time their decision had been reduced to writing or signed

by the foreman. Certainly no verdict was announced, nor was any opportunity given to test the unanimity of their finding, and they were discharged without any one but themselves knowing the nature of their verdict with respect to Fair. It may be that the trial court at that time should have called for the verdict as to Fair, and that if it was in due form it should have been received, notwithstanding the inability of the jury to agree as to the other defendant. But, although the court openly manifested its intention not to call for or receive a verdict as to Fair and to discharge the jury, no protest or objection was made by any party to the record, nor was any exception taken to the rulings of the court in that regard. On the contrary, when the court asked counsel for suggestions as to the course to be pursued in the circumstances, its request met with no response, although the attorney for the party now complaining was present in court at the time. The error, then, if any, is one of which the defendant company cannot now be heard to complain. As to the so-called verdict subsequently delivered to the bailiff and by him delivered to the court, it was delivered to the court after the jury had been discharged. It was delivered at a time and under such circumstances as made it impossible to apply the tests prescribed by sections 290, 291, *supra,* to determine whether it was in fact the unanimous decision of the jury on any matter lawfully submitted to them, and the court properly ignored it. It might be said, in passing, that we find no exception to any ruling of the court in that behalf. It would follow, then, that as no verdict in favor of Fair had been rendered when the second petition for removal was filed and submitted, the theory upon which that petition was presented, namely, that Fair had been eliminated from the controversy by a verdict in his favor, falls to the ground.

Three other assignments are in effect as follows: (1) That the court erred in overruling the motion of the defendant company for a verdict at the close of the testimony adduced by the plaintiff in making his case. (2)

That the court erred in refusing to direct a verdict for the defendant company at the close of the trial.  (3) That the evidence is insufficient to sustain a verdict in favor of the plaintiff and against the defendant company.  As to the first, the rule is that if the defendant at the close of the testimony adduced by the plaintiff in making his case asks the direction of a verdict against the plaintiff, and after an adverse ruling on his motion introduces testimony in his own behalf, he thereby waives the error, if any, in the overruling of such motion.  *Union P. R. Co. v. Mertes,* 35 Neb. 204, 39 Neb. 448.

The other two assignments both go to the sufficiency of the entire evidence to sustain the verdict and may be considered together.  That the plaintiff sustained the injuries hereinbefore mentioned by being run over by a freight train, or part of a freight train, operated by the defendant company on its tracks at South Omaha between 3 and 4 o'clock in the morning of August 11, 1902, is conclusively established.  The accompanying diagram represents with a fair degree of accuracy the *locus in quo.*  The lines running diagonally from the northwest to the southeast of the diagram represent a system of tracks and switches maintained by the defendant company and the stock yards company at South Omaha; each track is represented by a single line instead of a line for each rail. The lines lying to the east belong to the defendant company; those to the west, to the stock yards company.

It is insisted that the place where the injury occurred was not a public crossing, and that plaintiff in attempting to cross the tracks at that point was a mere trespasser, or licensee, to whom the defendant company owed no duty. The defendant company's passenger station, the hotels, stores, etc., of the city are on the east side of the tracks. N street is the principal retail street, and the passenger station is not two blocks north of it.  The stock yards, packing houses, and the offices and buildings used in connection therewith, and other places of business are west of the tracks.  The evidence shows that for many years the

route taken by the plaintiff in attempting to cross the tracks had been in common use by pedestrians crossing and recrossing the tracks at all hours of the day and night, and that from 400 to 500 people cross the tracks by this route every morning and evening. The use of this crossing by the public had been so extensive and long continued that it could not have been without the knowledge of the defendant company, and as it never objected to such use, nor took any steps to prevent it, such use must have been with its consent. In short, the evidence shows that the defendant company for many years and without objection permitted the public to cross its tracks at this point. That being true, it was bound to exercise reasonable care in the operation of its trains to guard against injury to those using the crossing. *Taylor v. Delaware & H. C. Co.,* 113 Pa. St. 162; *Keller v. Erie R. Co.,* 90 N. Y. Supp. 236; *Clampit v. Chicago, St. P. & K. C. R. Co.,* 84 Ia. 71. See also the following: *McCarty v. New York C. & H. R. R. Co.,* 76 N. Y. Supp. 321; *Boggero v. Southern R. Co.,* 64 S. Car. 104, 41 S. E. 819; *Bullard v. Southern R. Co.,* 116 Ga. 644, 43 S. E. 39; *Kroeger v. Texas & P. R. Co.,* 30 Tex. Civ. App. 87, 69 S. W. 809; *Blankenship v. Chesapeake & O. R. Co.,* 94 Va. 449, 27 S. E. 20; *Thomas v. Chicago, M. & St. P. R. Co.,* 103 Ia. 649, 72 N. W. 783; *Hooker v. Chicago, M. & St. P. R. Co.,* 76 Wis. 542, 44 N. W. 1085; *Jones v. Charleston & W. C. R. Co.,* 61 S. Car. 556, 39 S. E. 758; *Roth v. Union Depot Co.,* 13 Wash. 525, 43 Pac. 641; *Swift v. Staten Island R. T. R. Co.,* 123 N. Y. 645; *Chicago, B. & Q. R. Co. v. Russell,* 72 Neb. 114.

The evidence relied upon to show negligence in the operation of the train causing the injury and to sustain the charge of contributory negligence covers a large portion of a bill of exceptions containing over 1,000 pages. We cannot undertake to review it at length, but a somewhat extended statement of the facts and evidence can hardly be avoided in view of the questions presented. On the morning of the accident the plaintiff and some other stockmen arrived at South Omaha on a Burlington

freight train from the west. One car of stock belonging to the plaintiff was attached to the train. This train pulled in west of the tracks, shown by the diagram, and discharged its passengers two blocks north and about three blocks west of N street. The plaintiff and some of his companions on leaving the train went east, crossing the tracks by what is known as the L street viaduct to Twenty-seventh street, thence down that street to N street. It was necessary for the plaintiff to go to the chute house, located diagonally across the tracks from the corner of Twenty-seventh and N streets, in order to make arrangements for the disposition of his car-load of stock, which arrived on the train he had just left. He and one of his companions crossed the tracks and went to the chute house. At least one member of the party remained on the other side. While the plaintiff and his companions were in the chute house, the defendant company's freight train, which it is claimed caused his injuries, arrived from the west, moving north, according to the diagram, on what is designated as the "east bound main track." This train consisted of at least 35 cars, 16 of which were loaded with stock for the South Omaha market. The stock cars were from four to six cars behind the engine, and the remainder of the train was behind the stock cars. In order to cut out the stock cars and shift them from the tracks of the defendant company to those of the stock yards company, it was necessary for the train to pull north some distance beyond the point where the plaintiff was injured, switch over to the west bound track, back down that track to some distance south of said point, then uncouple the rear stock car from the cars following it, and pull north of the point where the plaintiff was injured a sufficient distance to enable a switch engine to move the stock cars to the stock yards tracks. After this was done the engine, with the four or six cars attached to it, was backed south on the west bound track, and past the point where the plaintiff was injured, to take up that portion of the train that had been left standing there while the stock cars were being shifted.

While the train was being thus shifted about, one of the defendant company's passenger trains passed through South Omaha, moving northward through the city on the east bound main track. That the plaintiff was struck and run over by the freight train, or some portion of it, while the passenger train passed over the crossing where the accident occurred is, to our minds, conclusively established, if not tacitly admitted. The plaintiff's theory is that he was struck by the rear car as the engine backed down the west bound main track with the four or six cars to take up the remaining cars after the stock cars had been set out. The defendant's theory is that the plaintiff was struck by the caboose at the rear of the freight train as it backed down the west bound main track the first time in order to cut out the stock cars, or that he fell under the train at that time while attempting to crawl between, over or under the cars while the train was in motion. The evidence is conclusive that the caboose was well lighted and that the usual signals of warning were given as the train backed down and over the crossing the first time. So that if the plaintiff was injured at that time his injury is no way traceable to any negligence on the part of the defendant company. If he fell under the train while attempting to crawl between the cars, or over or under the train while it was backing down, it goes without saying that the company would not be liable. The question, then, is whether the evidence is sufficient to sustain a finding that he was struck by the rear of the four or six cars that were backed down to make up the train after the stock cars had been cut out.

The plaintiff testified that the accident occurred between 3 and 4 o'clock in the morning; that he and his companion left the chute house on the morning of the accident and started to cross the tracks to N street for the purpose of going to their hotel. They took what the evidence shows was the usual route taken by pedestrians crossing the tracks from the chute house. On the way they met a man who said to them: "Now, boys, look out for the train,"

and as he spoke they looked south and saw the passenger train, hereinbefore mentioned, approaching on the east bound main track. There was then one or two tracks between them and the east bound main track. The following is a portion of his testimony as to what occurred from that time forward: "308. Q. As you continued on toward the foot of N street, from the time you met Mr. Paxton until you reached the point where you got hurt, what, if anything, did you do in the way of keeping watch upon your surroundings? A. I kept watching up and down the tracks both ways, as we walked on. 309. Q. What, if anything, did you do during that time to observe what, if anything, there was to the north of you? A. There were cars to the north of us. 310. Q. What did you do as you came along there? A. I just kept looking backwards and forwards up and down the track. 311. Q. Constantly? A. Yes, sir. 312. Q. And, in doing that, state whether or not there were any objects to the north of you? A. There were. 313. Q. What were there? A. I suppose, cars. 314. Q. Were they in motion or standing still? A. They appeared to be standing still. 315. Q. Were there any lights upon any of those cars that you saw to the north of you as you came on to the northeast? A. None that I saw; no, sir. 316. Q. Were there upon any of those cars? A. No, sir. 317. Q. Did you observe any of them move at all, while you were coming along in that direction? A. I did not. 320. Q. What was the condition of your sight? A. I had good eyesight. 321. Q. State whether or not you also watched this train that you spoke of as you continued to move on to the northeast. A. This passenger train, or this train that was coming? Yes, sir. 322. Q. This passenger train? A. Yes, sir. 328. Q. Did you get far enough to know whether you could cross in front of that train? A. I did. 331. Q. What were you doing up to the time that you were struck, from the time that you met Mr. Paxton? A. I had been traveling right along up until just that moment. I could not say positively whether I had just stopped, or was just in the act of stop-

ping, when I got hurt. 332. Q. If you had stopped, what was it for? A. To let this train go by. 333. Q. That is the train that was coming up from the south? A. Yes, sir. 334. Q. State whether or not you had kept up your looking to the right and left as you came along in that way until you were struck? A. I had. 336. Q. Up to the time you were so struck had you seen any car or train moving to your left or to the north of you? A. I had not. 337. Q. Had you seen any light upon any car to the north of you up to that time? A. I did not. 338. Q. Or did you at the time you were struck? A. No, sir. 542. Q. I am not sure but that I covered this question, but I will ask it again. Referring to the time of the injury, state whether or not at any time, from the time you started from the chute house until you were struck and run down, there was any light upon any car, or near any car, to the north of you? A. No, sir. 543. Q. And whether there was any light shining about you at or immediately before you received the injury or were knocked down? A. Nothing but the passenger, a light from the passenger train. 545. Q. None but that? A. None but that; no, sir. 546. Q. Any from the other side? A. No, sir. 1090. Q. You have ridden upon trains a good many times? A. Yes, sir. 1091. Q. You know they show some signals on the rear of all trains both by day and by night? A. Yes, sir. 1092. Q. You have noticed them on the rear of the caboose, have you? A. I have. 1093. Q. And the red lights that they display by night? A. Yes, sir. 1094. Q. And on this morning in question, as you started across the tracks, did you see something that would indicate to you to the north of the course that you were taking, that that there was a passenger train standing there, a passenger coach, or a caboose, by reason of the red lights on the rear end? A. I did not. 1095. Q. And as you continued on in that direction after the time you had met Mr. Paxton until you were struck, did you see anything of that kind to the north of you? A. I did not."

The testimony of his companion, covering the same

period, is as follows: "1277. Q. From the time that you and Connolly left the chute house until the time he was knocked down and run over, had you observed cars standing upon any of the tracks either way from you, as you came along? A. Yes, sir. 1278. Q. Which way had you observed cars standing? A. They were to our left. 1279. Q. To the left up the track? A. Yes, sir. 1280. Q. Did any of the cars which stood up to your left at the time have any lights on them? A. No, sir. 1288. Q. And was there any light or lantern upon any of those cars to your left as you came across? A. I did not see any. 1289. Q. What was the condition of your eyesight? A. My eyesight was good. 1295. Q. What sort of a view, if any, did you get of the car that knocked Mr. Connolly down? A. O, we did not get any view of it. It all occurred, you know (snapping his fingers), in an instant. I just saw this big black object passing over Connolly. 1296. Q. Coming right down on you? A. Yes, sir. 1297. Q. Was there any light on that that you could see? A. I saw none. 1298. Q. Was there any light flashed about you, at or immediately before you saw this big black object coming down on Connolly? A. No, sir. A. (continued) No, sir, there was no light."

Their companion who had remained on N street east of the tracks testified that he was there waiting for them to return when the passenger train came in; that at the same time he saw a freight train backing south on one of the tracks west of the track on which the passenger train was approaching; that he could see only the rear car, and that it displayed no lights, nor was there any person on the rear or top of the car; that after the passenger train had gone by he heard cries in the direction of where the accident occurred, and ran over, found the plaintiff lying beside the track, injured as before stated, and assisted in carrying him to the station and subsequently to the hospital. Another witness testified that he heard plaintiff's cries immediately after the accident, and upon investigation found him lying beside the rails of the west bound track.

We think it cannot fairly be said that the inference that the plaintiff was struck and run over by that portion of the freight train, consisting of four or six cars and the engine, which backed down and over the crossing after the stock cars had been cut out, is not one which might reasonably be drawn from the foregoing evidence. Of course, that evidence does not stand uncontradicted. It is irreconcilable with many facts and circumstances to which the witnesses produced by the defendants testified. On the other hand, it may be said that the testimony adduced by the defendants to rebut plaintiff's theory as to how the accident occurred is not, in every instance, easily reconcilable with the undisputed facts. The most that can be said on this branch of the case is that the evidence is conflicting and that it turns on the credibility of the witnesses. The jury were permitted to view the *locus in quo.* To pass upon conflicting evidence and the credibility of witnesses is within the peculiar province of the jury. On such questions their finding will not be disturbed unless clearly wrong. We consider the evidence ample to sustain plaintiff's theory as to how the accident occurred. Consequently, it stands as one of the questions settled by the verdict that the plaintiff was struck by the cars while the engine and the four or six cars were backing south on the west bound main track. That the rear car of that portion of the train displayed no lights, and that no person was stationed thereon, or at the crossing, to give warning of its approach to the crossing, are facts conclusively established by the evidence and practically conceded. The accident occurred in a populous community and within the limits of a considerable city. It occurred in the nighttime, and at a crossing in common use at all hours, and where, as we have seen, the defendant company was charged with the duty of exercising reasonable care to avoid injury to those crossing its tracks. It is true, it seems to be conceded that the bell was rung and the whistle sounded to give warning that the train was moving. But the mere fact that the statute requiring such warnings was complied with does

not of itself show that the defendant had discharged its full duty to those using the crossing. It was bound to use reasonable care not to endanger those who might be lawfully upon its tracks at the crossing, and whether, in view of the time, place and circumstances, precautions in addition to those prescribed by the statute were required, was a question for the jury. *Byrne v. New York C. & H. R. R. Co.,* 104 N. Y. 362; *McCarty v. New York C & H. R. R. Co.,* 76 N. Y. Supp. 321; *Bullard v. Southern R. Co.,* 116 Ga. 644, 43 S. E. 39; *Missouri P. R. Co. v. Geist,* 49 Neb. 489. The crossing was in common use day and night. It was across tracks in constant use, and in a populous and busy community. That due care required more than ringing the bell and sounding the whistle to give warning of a freight train backing toward and over such crossing in the nighttime is certainly not an unreasonable inference in view of all the facts and circumstances. *Chicago, B. & Q. R. Co. v. Russell,* 72 Neb. 114.

But the defendant company contends that, even though its negligence be established, the evidence discloses such negligence on the part of the plaintiff contributing to the injury as to preclude a recovery. This contention is based on certain inferences which counsel draw from the the testimony of the plaintiff and the man who accompanied him across the track, who are the only ones having actual knowledge of their acts after meeting the man who warned them to look out for the train. After reviewing their testimony at some length, counsel sum up in these words: "This testimony in short discloses that Connolly was familiar with the tracks at the point where the accident occurred, and so thoroughly had in mind the danger of crossing the tracks at that point that he mentioned it to Moore after leaving the chute house; that he knew the trains were liable to pass up and down the tracks at any moment; that he knew the noise made by the passenger train might drown the noise of signals made by any other train, and yet the conclusion, from the manner in which he was struck and thrown down, is irresistible that, when

the passenger train was a block and a half away, he was standing still between the rails of the west bound track, watching the headlight of the train approaching from the south, and taking no note of any train approaching from the north." It is undisputed that the plaintiff had been shipping stock from Wyoming to South Omaha for some ten years, was familiar with the tracks where the accident occurred, and was fully alive to the fact that for a pedestrian to cross the tracks was attended with more or less danger. It may be conceded, too, that the conclusion which counsel characterize as irresistible is one that might reasonably be drawn from the evidence. But we are unable to concur in the view that it is irresistible. We have heretofore set out a portion of the testimony of the plaintiff and his companion. Detached portions of the plaintiff's testimony might be interpreted to mean that "he was standing still between the rails of the west bound track, watching the headlight of the approaching train from the south and taking no note of any train approaching from the north," at the time he was struck by the freight train. But taking his evidence as a whole, it may reasonably be inferred therefrom that, after meeting the man who warned them to look out for the passenger train, they continued their way across the tracks until they reached a point from which they could see that they could not cross in front of that train; that he was struck by the freight train at the instant he stopped, or was about to stop, to wait until the passenger train had passed the crossing; that from the time he left the chute house up to the very instant he was struck he looked constantly up and down the tracks, north and south, to guard against danger from approaching trains; that, owing to the noise of the passenger train, the darkness, the nature of the plaintiff's surroundings at the time, and the failure of the defendant company to display any light on the rear of the freight train, or to station any person there, or at the crossing, to give warning of its approach, the plaintiff failed to discover that it was approaching until he was

struck. We do not wish to be understood to say that the foregoing facts are conclusively established, nor even that they are the most reasonable inferences to be drawn from the evidence. The most that we would be understood to say in this connection is that such facts are not unreasonable inferences from the evidence of the plaintiff and his companion. The settled rule in this state is that, where different minds might reasonably draw different inferences from the same state of facts, whether such facts establish negligence is a question for the jury, and not for the court. *Chicago, B. & Q. R. Co. v. Landauer,* 36 Neb. 642, 39 Neb. 803; *Elliott v. Carter White Lead Co.,* 53 Neb. 458, and cases there cited. From the vantage ground of afterwards, it is easy to see how the plaintiff might have avoided the injury. When he saw the incoming passenger train he might have gone to some place of safety and waited for it to pass. He might, possibly, have stood between the tracks, or in the triangle formed by one of the switches nearby, or on other safe ground. But it must be kept in mind that a person having occasion to pass over a crossing like the one in question, where trains are constantly passing and repassing, can seldom wait for the tracks to be perfectly clear. He is not always able to tell just when he is between the rails of one track or between different tracks, nor to determine with accuracy the safest course to pursue. He is threatened with danger from every point, and cannot give his undivided attention to any one source of danger. His attention is distracted by unusual sights and sounds, and conditions are not favorable to the exercise of the best judgment. He has a right to presume that those operating trains will use due care for his safety. The law does not require him to exercise unerring judgment nor the highest degree of care, but merely that he exercise such care as a man of ordinary prudence would exercise under like circumstances. The jury have said by their verdict that the plaintiff exercised due care. That is their inference from the evidence. Other minds might reasonably reach a different conclusion,

but it cannot be said, we think, as a matter of law, that negligence on the part of the plaintiff is the only reasonable inference to be drawn from the testimony of these men.

The defendants offered the evidence of a witness taken at a former trial of the cause. Among other things this evidence shows that the witness had a conversation with the plaintiff immediately after the accident, in which he told how the accident occurred. One question to the witness was: "State to the jury what you heard Mr. Connolly (plaintiff) say." The answer was: "Well, me and Coulter walked up to him and says—asked him how this happened, and Connolly spoke very low. I am pretty certain that he said they tried to get through the cars, and crawled through the cars somewhere, and my impression was, at the time, they went over the bumpers between the cars." An objection to the answer offered was sustained, and the defendant company now complains of this ruling. That part of the answer stating the "impression" the witness had at the time was clearly incompetent. As to the rest, substantially the same matter was subsequently received as a part of the testimony of the witness. The ruling therefore deprived the defendant company of nothing it was entitled to.

The defendant company called the plaintiff's attorney as a witness, and after showing by him that on the former trials of the cause he had made the opening statement to the jury, in which he had stated that it was a freight train that run over the plaintiff, offered to show that he had never stated that it was four, six or eight cars that had run over him, previous to the last preceding trial. The offer was rejected, and the defendant company now claims it was entitled to show this fact, in view of its theory that it was the entire train, and not the portion attached to the engine after the stock cars were cut out, that inflicted the injury. We do not pretend to say how far a client may be bound, if at all, by an opening statement made by counsel at a former trial. But he certainly could not be preju-

diced by the fact that his attorney failed to distinguish
clearly between a train and part of a train, or to state the
number of cars constituting what he designated as a train.
We think the evidence was properly excluded.

Several assignments of error are based on rulings of the
court permitting the plaintiff to introduce the testimony
of the conductor of the freight train taken on a former
trial. This testimony was offered on rebuttal, and was in
reference to the length of the train, the movements of the
cars that remained with the engine when the train was
divided at South Omaha to cut out the stock cars, the
length of time required for the train to run from South
Omaha to Council Bluffs, and the time it registered at
Council Bluffs that morning. The objection urged against
this testimony is that it was not proper rebuttal. We
think it was. The defendants produced a larger amount
of testimony tending to support the theory that the plain-
tiff had been injured either by being struck by the rear
car while the whole train of some 36 cars was backing
over the crossing, or by crawling between, over, or under
the cars of that train. Had either of those theories been
established, the plaintiff, as we have seen, would have
been convicted of contributory negligence. The conduc-
tor's evidence offered in rebuttal tended to negative those
theories and was properly received.

The defendant company complains of an instruction
given by the court in these words: "The burden of proof
is upon the plaintiff to establish by a preponderance of
the evidence: (1) That the place where the plaintiff was
injured was a crossing over defendant's railroad track
which had been commonly used by pedestrians for such a
length of time that defendant knew of its said common
use, or by the exercise of reasonable care should have
known it; (2) that the plaintiff was injured substantially
as alleged; (3) that said injury was caused by the negli-
gence of the defendants, the railroad company and Fair,
or by defendant railroad company in some one or more
of the ways charged in the plaintiff's petition; and (4)

the amount of damages occasioned thereby to the plaintiff, the defendants, and each of them, having alleged that, if the plaintiff received the injuries as alleged, the injuries were the result of the negligence of the plaintiff which contributed thereto; and the burden of proof of negligence on the part of the plaintiff is upon the defendants to establish by a preponderance of the evidence, unless you find that the evidence introduced by the plaintiff discloses negligence on his part which in any way caused or contributed to his injury, then it devolves upon the plaintiff, before he can recover, to prove by a preponderance of the evidence, not only that the negligence of the defendants, or either of them, caused his injury, but also that he himself was free from any negligence on his part, that contributed to his injury, and, in this case, you are instructed that, as a matter of law, the negligence of the defendant Fair, if you find from a preponderance of the evidence that he was negligent, would be the negligence of the railroad company." The first criticism of this instruction is that while the only joint charge of negligence against the defendants was the failure to ring the bell or sound the whistle on the train causing the injury, all the others being against the company alone, this instruction permitted a recovery against the defendant company alone, not only on the charges exclusively against it, but on the charge made against the defendants jointly. The criticism seems to be unfounded. The office of this instruction was to inform the jury as to the burden of proof. By subsequent instructions the jury were positively directed that on the matter of negligence in failing to ring the bell and sound the whistle, if they found such negligence, both defendants would be liable, but if there was no negligence in that particular, or if there was negligence in that particular, but it was not a proximate cause of the injury, neither defendant would be liable on the joint charge, and that plaintiff could not recover except on some other charge of negligence.

Another criticism on this instruction is that the rule

stated in the fourth paragraph as to the burden of proof ·
on the question of contributory negligence is at variance
with that announced by this court in *Rapp v. Sarpy
County,* 71 Neb. 385, and *City of Beatrice v. Forbes,* 74
Neb. 125, where the doctrine that the burden of proof on
the question of contributory negligence, under certain
circumstances, may shift to the plaintiff was repudiated.
In so far as the rule stated by the district court is at va-
riance with the rule announced in those cases, it is more
favorable to the defendants than it should have been, and
they cannot be heard to complain of it on that ground.

Still another criticism of this instruction is that it "is
upon the burden of proof and not upon the effect, as be-
tween the parties, of contributory negligence on the part
of the plaintiff below that may be disclosed by the evi-
dence, the instruction saying, in effect, that if the evidence
introduced by the plaintiff does disclose contributory
negligence, then the burden of proof is upon him to show
that in fact he was not guilty of contributory negligence."
While this part of the instruction is not framed in the
clearest language, we do not think the jury were misled
by it to the defendant company's prejudice. Negligence
"which in any way caused or contributed to his (plain-
tiff's) injury" would not necessarily be contributory
negligence. An act or omission, to constitute contribu-
tory negligence, must be something more than a remote
cause in the chain of circumstances (*Lowrimore v. Pal-
mer Mfg. Co.,* 60 S. Car. 153, 38 S. E. 430), but must be
such as operates as the proximate cause, or one of the
proximate causes, and not merely as a condition. *Smith-
wick v. Hall & Upson Co.,* 59 Conn. 261, 12 L. R. A. 279,
21 Am. St. Rep. 104. See, also, 2 Words and Phrases
Judicially Defined, 1544. This part of the instruction,
then, reasonably admits of the construction that, if the
plaintiff's testimony disclosed that the injury was in any
way related to any negligent act or omission of his, the
burden of proof was upon him to show that such act or
omission was not the proximate cause, or one of the prox-

imate causes, operating to produce the injury. This was at least as favorable as the defendants had a right to ask.

The court instructed the jury that it was the duty of the plaintiff to look and listen for the approach of trains, and the defendant company complains because the jury were not specifically instructed as to the directions in which he was required to look. If a more explicit instruction was desired on this point the party desiring it should have tendered one covering the ground. Neither of the defendants did so, and the instruction as it stands is not erroneous.

On the question of damages, the court instructed the jury as follows: "If you find for the plaintiff under the evidence and these instructions, in determining the amount of his recovery, you should take into consideration the nature and extent of his injuries, the fact that certain injuries are permanent, plaintiff's natural expectancy of life, any mental or physical pain which you find from the evidence he has suffered resulting from the injury, any expense necessarily incurred on account of the injury for surgical and medical care and hospital fees as shown by the evidence, his loss of earnings in the carrying on of his business since the injury which the evidence shows to have been caused by the injury, together with such future loss of earnings due to the injury as you find from the evidence to a reasonable certainty will be caused by the injury, and return a verdict for the plaintiff in such an amount as you so find under the evidence and these instructions will be a fair and reasonable compensation for such expense, loss of earnings in the past, and such loss of earnings in the future as you find to a reasonable certainty will result from his injuries, together with fair and reasonable compensation for such pain and suffering as you find to be established by the evidence. If you find for the defendants, or either of them, you will so state in your verdict." The objections lodged against this instruction are that it does not give any rule by which to estimate damages in cases of this kind, nor by which the

present value of future earnings may be determined. Instructions on the question of damages in cases of this character must of necessity be more or less indefinite. The instruction given is at least as definite and certain and as favorable to the defendants as that approved by this court in *City of South Omaha v. Sutliffe,* 72 Neb. 746. No instruction was tendered by any of the parties covering the same subject, and the complaint now made against it should be overruled.

Complaint is made of certain acts of the trial judge committed, not while the trial was actually in progress, but during intermissions and adjournments. The complaint is that during such times he unduly manifested a friendly feeling, or interest, in the plaintiff in the presence of the jurors. This complaint was included in the motion for a new trial, and was supported by affidavits, which were met by counter affidavits. While these affidavits show that the learned judge treated the plaintiff with more familiarity and consideration than is generally shown a litigant by the trial judge, yet it does not appear that his treatment of the plaintiff differed substantially from that accorded by him to all others with whom he came in contact during the trial. While the record falls far short of convicting the trial judge of misconduct, or of showing that the defendant company was prejudiced by his conduct toward the plaintiff, it shows the advisability of a trial judge maintaining a proper distance between himself and the litigants before him in order to guard against the appearance of evil liable to arise from a failure to do so.

The attorneys for the plaintiff were also charged with misconduct in the motion for a new trial. That matter was submitted to the trial court on conflicting evidence, and its finding thereon cannot be disturbed.

It is also claimed that the court erred in overruling challenges for cause to certain jurors. Their examination on *voir dire* is set out at length in the record. This opinion is already too long, and it must suffice to say that the ex-

amination of these jurors, taken as a whole, shows that it was not error to overrule the challenges.

It is strenuously contended that the verdict of $27,500 is excessive. As we have seen, as a result of the accident both plaintiff's legs were amputated a few inches below the knee. At the time of the injury plaintiff was 31 years of age, in robust health. He had a life expectancy according to the Carlisle table of over 33½ years. He had been raised on a cattle ranch in Wyoming and was engaged in raising stock in that state. He owned 160 acres of land and held two sections under a lease. He had a herd of some 75 horses and 100 cattle which grazed upon his own land and miles of uninclosed land in that vicinity. His evidence shows that the returns of his business netted him, annually, from $400 to $600 over and above what was required for the support of himself and family, and over and above the increase of his herds. He earned considerable breaking horses for cavalry use; his injury cut off that source of income. Many of the things he could do for himself in the conduct of his business he must now hire done. That he will sustain a direct pecuniary loss of at least $1,000, annually, as a result of the accident is a reasonable inference from the evidence. At his age an annuity of $1,000, payable quarterly, would cost $18,876. In addition to this, he has paid out considerable sums and suffered other losses in consequence of the accident. Although the accident occurred some years ago, as a result he still suffers considerable bodily pain, which, according to his testimony, keeps him awake until he is worn out toward morning. The bodily pain he suffered, and still suffers, from the injury is a proper element of damage. There is no hard and fast rule for estimating the amount to be allowed for that element. The most that can be said is that the jury must be governed by reason and common sense. In *Swift & Co. v. Holoubek*, 62 Neb. 31, a boy between 14 and 15 years old recovered a judgment for $11,500 for the loss of three fingers and part of a hand, leaving the thumb and index finger capable of some use.

This court reduced the judgment to $7,500. In *Chicago, B. & Q. . . Co. v. Krayenbuhl,* 70 Neb. 766, an infant four years old recovered a judgment for the loss of a foot. This court, after ordering a remittitur, fixed his recovery at $9,000. In *New Omaha T.-H. E. L. Co. v. Rombold,* 68 Neb. 54, this court held that a verdict of $15,000 was not excessive for the loss of a foot in the case of a man earning $65 a month, whose earning capacity was not thereby entirely destroyed. In the case of *Texas & N. O. R. Co. v. Kelly,* 30 Tex. Civ. App. 21, 80 S. W. 1073, a man 54 years of age, or 23 years older than Connolly, earning from $1,200 to $1,500 a year, was so injured that both his legs were paralyzed, and it was held that a recovery of $30,000 was not excessive. In *Ehrman v. Brooklyn City R. Co.,* 14 N. Y. Supp. 336, a child 3½ years old suffered injury causing the amputation of one leg above the knee. It was held that a verdict for $25,000 was not excessive. In *Illinois C. R. Co. v. Souders,* 79 Ill. App. 41, a woman 54 years old, who kept a boarding house, received a permanent injury to her arm and her lungs, but she did not lose either hand or foot. It was held that a recovery of $20,000 was not excessive.

In *Kalfur v. Broadway F. & M. A. R. Co.,* 54 N. Y. Supp. 503, a child 18 months old lost one leg above the knee. It was held that a recovery of $15,941.25, was not excessive. In *Chicago City R. Co. v. Wilcox,* 33 Ill. App. 450, a boy six years old lost one leg. It was held that a recovery of $15,000 was not excessive. In *Roth v. Union Depot Co.,* 13 Wash. 525, a child nine years old lost one leg. *Held,* That a recovery of $15,000 was not excessive. In *Western Union T. Co. v. Engler,* 75 Fed. 102, plaintiff suffered a compound fracture of his leg, causing the bone to protrude and denuding the periosteum. Many pieces of bone were taken out, and pieces continued to work out for 20 months afterwards. There was no amputation and amputation was not necessary, but it appeared that the plaintiff would probably be permanently lame. It was held that a recovery of $15,000 was not excessive. In *Chicago, B.*

& Q. R. Co. v. Dunn, 106 Ill. App. 194, it was held that $15,000 was not excessive for the loss of one leg. In Howe v. Minneapolis, St. P. & S. S. M. R. Co., 62 Minn. 71, it was held that a verdict for $14,500 was not excessive in the case of a young man permanently disabled, but who lost neither hand nor foot. In Smith v. Metropolitan Street R. Co., 86 N. Y. Supp. 1087, it appeared that the plaintiff was injured in a collision between a street car and a vehicle. He was in the hospital about two months, but was unable to return to his regular business until about 10 months after the injury. It appeared that he would not likely fully recover from his injuries, but that he was not permanently disabled. It was held that a recovery of $20,000 was proper. In Alberti v. New York, L. E. & W. R. Co., 43 Hun (N. Y.), 421, a man 30 years of age was injured so that his legs were permanently crippled, but not lost. It was held that a verdict of $25,000 was not excessive. In Williamson v. Brooklyn Heights R. Co., 65 N. Y. Supp. 1054, it was held that a verdict of $22,500 was not excessive in the case of a boy 11 years old who lost one leg. In Stewart v. Long Island R. Co., 66 N. Y. Supp. 436, it was held that $18,000 was not excessive in the case of a young man whose arm was permanently disabled and who suffered some nervous injury. In view of the actual pecuniary loss that must necessarily follow an injury of this kind to a man of plaintiff's age, business and situation in life, the physical pain and manifold inconveniences he has suffered and must continue to suffer, the recoveries upheld by this and other courts in similar cases, we cannot say that the damages awarded are excessive.

After a careful examination of the record, we are satisfied that it contains no reversible error, and recommend that the judgment of the district court be affirmed.

DUFFIE and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.